SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

Charles Phillip ELLIOTT, et al., Defendants,

Charles O. Farrar, Receiver–Appellee,

Kenneth J. Davis, Linda J. Davis, Leroy H. Moeller, As Personal Representative of the Estates of Adolph Hagstrom, Squire J. Kingston, Elizabeth Woods, Caroline Estelle, Lynnis H. McClain, Ted Masco, Anita K. Hailey, Earl Setterblade, Francis Setterblade, Lloyd Schutzman, Shirley Schutzman, Albert C. Heil, Melvin Burkhardt, Rosa Ella Burkhardt, Howard Dore, Ruth Dore,

Gerald J. Braun, Christie Braun, Monica Brooke Braun, C. Albert Ducharme Trust and Catherine F. Ducharme Trust, Seaton F. McDaniel, Josephine McDaniel, Trudy and Sidney Kleiner, Claimants–Appellants.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

Charles Phillip ELLIOTT, et al., Defendants,

Charles O. Farrar, Receiver–Appellee,

Melvin Burkhardt and Rosa Ella Burkhardt, Movants–Appellants.

Nos. 89–5457, 89–5528.

United States Court of Appeals, Eleventh Circuit.

Feb. 27, 1992.

Merrill N. Johnson, Naples, Fla., for K. Davis.

Kathleen Monahan, Miami, Fla., for L. Moeller.

Mark A. Ebelini, Ft. Myers, Fla., for H. Dore.

Ronald L. Stetler, Naples, Fla., for Virginia Moore.

John Charles Coleman, Robert J. Coleman, Seaton F. and Josephine A. McDaniel, Ft. Myers, Fla., Gertrude and Sid Kleiner, Naples, Fla., Kathleen A. Monahan, Joaquin Mendez, Miami, Fla., for C. Albert Ducharme Trust.

Lyons and Farrar, Miami, Fla., for Farrar.

Frank P. Murphy, Naples, Fla., for S.J. Kingston and Melvin and Rose Ella Burkhardt.

Marsha Lyons, Lyons & Farrar, William Sadowski, Miami, Fla., for Securities and Exchange Com'n.

Before FAY and HATCHETT, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

## I. THE RECEIVERSHIP

The Securities and Exchange Commission brought a complaint against Charles Phillip Elliott, Charles Phillip Elliott d/b/a Elliott Enterprises, Elliott Securities, Inc., and Elliott Mortgage Co., Inc., for various violations of the Securities and Exchange Act. The district court granted a perma-

nent injunction enjoining further securities violations and appointed Charles O. Farrar as Equity Receiver for Elliott.[1] The Receiver was ordered to take possession of the companies' assets, to file an initial report of the state of these assets, and to propose a plan of distribution of assets to victims of Elliott.

There were nearly two-thousand claims filed, each of which had to be dealt with by the Receiver and, ultimately, by the district judge. Finally, the district court entered an Order Establishing Final Plan for Distribution of Assets, from which twenty-seven claimants appeal, raising numerous objections to the Final Plan.

Elliott was engaged in a massive Ponzi-type scheme. He devised several programs as vehicles for the victims to "invest" in his companies. He offered conditional sales agreements and beneficial interest agreements (treasury bond agreements), where for his or her investment, the investor would receive periodic tax-free interest payments up to an annual rate of 15%. These investments were supposed to be secured by municipal and treasury bonds placed in the custody of third parties. There were some shortcomings in Elliott's programs: the interest was not tax-free, and Elliott did not purchase any bonds as collateral.

Elliott also offered a special Stock or Bond Income Program Agreement. If an investor's stock was not paying him large enough dividends, he could deposit his stock certificates with Elliott, giving him the right to purchase the stock at fair market value. In return, Elliott agreed to make monthly interest payments that would exceed what the investor was currently earning on his stocks and bonds. Unfortunately, the investor unwittingly transferred legal title to the stocks and bonds to Elliott when he entered these agreements. Elliott acquired the funds to make the monthly payments to investors by selling their stock.

With Notes and Collateral Loan Agreements, Elliott promised investors that, in return for their investments, he would make monthly payments and secure their investments with stocks and bonds. In reality, these stocks and bonds did not exist, Elliott never deposited them with a third party custodian, or the stocks and bonds were already hypothecated. In return for some of the investments, Elliott gave investors promissory notes "secured by the full faith and credit of Elliott Mortgage."

Elliott made many other false representations, including that his company was a registered investment advisor, that Elliott Enterprises was an underwriter for municipal bonds, that the investments were tax-free, and that his companies had received a "clean bill of health" from periodic audits by the Florida Department of Professional Regulation. As a result of these misrepresentations, Elliott managed to convince people who were anxious to believe that they could earn high returns that their investments were secured when they were not. Part of Elliott's con was creating documents that made investors believe they were secured.

It is this web of false representations that the Receiver and district court were called upon to disentangle for the benefit of defrauded claimants. Elliott had sold many of the securities and depleted the money invested so that practically none of the claimants would recover more than a small fraction of their investments. The district court ordered the liquidation of Elliott's estate and established a claims procedure by which claimants would file their proofs of claim. One thousand eight hundred and ninety (1,890) claims were filed. One year later, the Receiver requested permission to notify the claimants of his Proposed Plan for Distribution of Assets. In this plan, the Receiver delivered its factual findings and advised the district court of the legal status of each claim. The district court entered an Order authorizing the Re-

---

**1.** Since Elliott had commingled funds between the various companies and had failed to maintain a strict separation of the companies, the district court treated the various companies as one entity for the purpose of the receivership proceeding. When we refer to Elliott, this refers to the man and his various companies.

ceiver to notify claimants of the plan, to provide them instructions, and to create fill-in-the-blank pleading forms for filing objections within thirty days of the notice. After the objections were filed, the Receiver responded by briefing the district court on the factual and legal issues raised in the objections. In some cases, the claimants replied to the Receiver's response to their objections. Then, the district court entered its Order Establishing Final Plan for Distribution of Assets.

The district court and Receiver had a mammoth task before them, and they did a thorough job. However, because of the sheer size of the receivership estate and the huge number of claimants, it was inevitable that some of the claimants' objections would not be treated as completely as the objecting parties desired. Of the one thousand sixty-two (1,062) claimants, twenty-seven appeal. We will deal with each of their appeals in turn.

## II. DUE PROCESS

Many of the appellants argue that their property was taken without due process of law. They allege that the procedure used by the district court in disposing of the Receiver's assets did not adequately protect their property.

Due process requires notice and an opportunity to be heard. *Cleveland Bd. Of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985); *Greene v. Lindsey,* 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982). Due process essentially requires that the procedures be fair. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The process that is due varies according to the nature of the right and to the type of proceedings. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). In *Eldridge,* the Supreme Court applied a balancing test to determine what type of procedure was required. The Court looked at the strength of the private interest, the risk of erroneous deprivation, the probable value of additional or substitute safeguards, and the government interest, "including the func-

tion involved and the fiscal and administrative burdens that the additional or substitute procedural requisites would entail." 424 U.S. at 335, 96 S.Ct. at 903. Generally, if government action will deprive an individual of a significant property interest, that individual is entitled to an opportunity to be heard. *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). However, a hearing is not required if there is no factual dispute. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam) (a discharged employee had no right to a hearing since he did not challenge the fact upon which the dismissal was based).

With these factors in mind, we must decide whether the summary procedure the district court used violated the appellants' due process rights. Rule 56 of the Federal Rules of Civil Procedure gives the district court summary jurisdiction over all the receivership proceedings and allows the district court to disregard the Federal Rules. The district court has broad powers and wide discretion to determine relief in an equity receivership. *SEC v. Safety Finance Service, Inc.,* 674 F.2d 368, 372 (5th Cir.1982); *SEC v. Lincoln Thrift Ass'n,* 577 F.2d 600, 609 (9th Cir.1978); *SEC v. United Financial Group, Inc.,* 474 F.2d 354, 358 (9th Cir.1973). This discretion derives from the inherent powers of an equity court to fashion relief. *Safety Finance,* 674 F.2d at 372. In granting relief, it is appropriate for the district court to use summary proceedings. *SEC v. Hardy,* 803 F.2d 1034, 1040 (9th Cir.1986).

The government's and parties' interests in judicial efficiency underlie the use of a single receivership proceeding. *Smith v. American Industrial Research Corp.,* 665 F.2d 397, 399 (1st Cir.1981). A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets. *SEC v. Wencke,* 783 F.2d 829, 837 (9th Cir.1986), *cert. denied,* 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33 (1986). *United States v. Arizona Fuels Corp.,* 739 F.2d 455, 460 (9th Cir.1984).

■ While the term "summary" connotes that the procedure was abbreviated, it does not mean that the parties received no procedure at all. We must look at the actual substance, not the name or form, of the procedure to see if the claimants' interests were adequately safeguarded. *Wencke*, 783 F.2d at 836. Summary proceedings are inappropriate when parties would be deprived of a full and fair opportunity to present their claims and defenses. *Id.* at 837 n. 9. The appellants must show how they were prejudiced by the summary proceedings and how they would have been better able to defend their interests in a plenary proceeding. *Id.* at 838. *See SEC v. Universal Financial*, 760 F.2d 1034, 1037 (9th Cir.1985).

In *Lincoln Thrift*, the district court approved the receiver's decision to liquidate the company. 577 F.2d at 605. The creditors of the company appealed this decision, arguing that the district court should have transferred the proceedings to a bankruptcy court or should have allowed a creditor's committee to carry out the plan of liquidation. *Id.* The creditors apparently believed that these procedures would better protect their interests. However, because the district court appointed *amicus curiae* to represent the creditors in the proceedings, provided notice to the creditors of the litigation, and conducted a full hearing on the liquidation, the Ninth Circuit held that the district court had not abused its discretion. *Id.* at 609. *See also Arizona Fuels*, 739 F.2d at 459 (due process was not denied when appellant had notice of and an opportunity to challenge the receiver's denial of setoffs).

In *Universal Financial*, the receiver and investors disagreed over who owned borrower notes and supporting deeds of trust. 760 F.2d at 1037. Under its summary jurisdiction, the district court held two "test cases" to determine ownership. *Id.* After finding that the investors owned the notes, the district court ordered ten additional cases for trial. The investors challenged this order, asserting that collateral estoppel should bar relitigating the same issues of the test cases. *Id.*

The investors argued that summary jurisdiction is unconstitutional when a claimant presents a substantial claim that he, rather than the receiver, is the owner of an intangible chose in action. However, the investors failed to show how the summary proceedings differed from the process they would have received in a plenary proceeding. By granting them discovery, the right to take depositions, and the ability to file briefs and exhibits in connection with the test cases, the district court afforded them the same procedural protections that would have been available in a plenary proceeding. *Id.*

In *Wencke*, the appellant challenged the district court's ruling that a company in which he owned stock disgorge profits and stock traceable to wrongdoing. The appellant's due process challenge to the summary disgorgement proceedings failed because he had notice of the proceedings, had an opportunity to file responsive pleadings and perform discovery, and could have presented evidence and cross-examined witnesses at hearings before the magistrate and district judge. 783 F.2d at 838.

■ Thus, a district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts. We will now examine the various appellants' claims to due process.

## III. FRAUDULENT TRANSFERS

■ Lloyd and Shirley Schutzman made an unsecured $113,000 investment with Elliott pursuant to several conditional sales agreements, the last dated August 16, 1986. On March 13, 1987, approximately two weeks prior to the institution of this receivership, Schutzman and Elliott entered an agreement whereby Elliott put up $85,000 in municipal bonds as collateral for a debt he already owed. As consideration, Elliott's interest payments were decreased from 10% to 9%. In its Order Establishing Final Plan, the district court set aside this transfer. Pursuant to Fla.Stat. § 726.01, the district court found that under the facts and circumstances, the transfer was

made with the intent to delay, hinder or defraud creditors. The district court also found that the Schutzmans did not have the Florida statutory affirmative defense of bona fide purchaser—purchasing without knowledge of wrongdoing with reasonable value.

The Schutzmans argue that their due process rights were violated since they did not have an opportunity to present evidence on the nature of the transfer or of their affirmative defenses. On July 14, 1988, after the Proposed Plan was sent to claimants and during the period for objections, the Schutzmans filed a motion asking for a hearing, intervention, and limited discovery on the issue of fraudulent transfer. The Schutzmans also filed an objection to the plan, merely asserting that their investment was secured. The Receiver responded to these objections by briefing the court on Florida law and presenting exhibits demonstrating the timing of the transfer. The district court never responded specifically to the Schutzmans' motion, but made a fact finding of fraud in its Final Plan. However, the district court did not discuss which facts it used in its analysis or how it found the facts if it did, indeed, find them.

Fla.Stat. 726.105(1)(a) lists several factors the court should use in determining the debtor's intent in making the transfer. These include the timing of the transfer, whether the debtor was insolvent, whether the debtor removed or concealed assets, whether the transfer occurred shortly before a substantial debt was incurred, and whether the transfer was to an insider. Fla.Stat. 726.105(1)(a). We can surmise that the district court based its finding of fraud on the timing of the transfer and Elliott's insolvency. The district court had evidence before it that Elliott was aware of the SEC investigation and the possibility of the present lawsuit. The receivership itself was evidence of Elliott's insolvency.[2] These facts may very well be enough to support the district court's finding that the bonds were transferred with intent to defraud.

However, the Schutzmans were entitled to more procedural protections. We note that the Receiver did assert facts from which the district court could make an independent decision, but the Schutzmans had no opportunity to dispute these facts. The Receiver's procedure was not adequate to protect the Schutzmans' interests. This procedure required claimants to complete blank forms setting out the grounds for their objections. Although this procedure might have been sufficient for other claimants whose claims were not as complicated, the Schutzmans asserted claims that required an evidentiary hearing. It may turn out that the facts are undisputed, but this has not been determined. The Schutzmans should have their chance to rebut the characterization of the transfer and present affirmative defenses pursuant to the Florida statute.[3] The structure of the hearing is left to the discretion of the district court so long as the Schutzmans can present and argue their facts.

## IV. SECURITIES

Elliott talked investors into "loaning" him their securities. He convinced the investors that he could get them a return on their money far greater than they were currently earning in dividends from their securities. In exchange for the securities, Elliott gave them a promissory note, equal to the market value of the securities, promising to make monthly interest payments. The investors delivered the securities to Elliott with executed powers of attorney attached. Elliott could satisfy his obligation to pay either by returning the secu-

---

**2.** In its brief and in its trial response, the Receiver makes the bald assertion that Elliott was concealing assets, but the Receiver points to no evidence to support this assertion. The Receiver also makes an unsubstantiated claim that the Schutzmans were interviewed by the SEC.

**3.** The Schutzmans also argue that they were discriminated against in that other investors were treated differently. This argument is without merit. Other investors were permitted to cash in their principal prior to the institution of the receivership because their collateral was not transferred fraudulently. Other investors merely received interest income, which were not fraudulent transfers.

rities or by making a cash payment. The district court found, and we agree, that what in fact transpired was that the investors unwittingly transferred legal title in the securities to Elliott.

The appellants Caroline Estelle, Squire J. Kingston, Elizabeth Woods, Ted Masco, Lynnis H. McClain, Anita K. Hailey, Earl Setterblade, C. Albert Ducharme Trust, and Catherine F. Ducharme Trust seek return of the securities on two grounds. First, the appellants argue that they retained legal title. Alternatively, the appellants argue the securities agreement should be rescinded since it was the product of fraud.

■ In the Final Plan, the district court found that these investors were unsecured. We take this to mean that the district court found that the investors no longer had legal title to the property. The Receiver, Squire Kingston, and Elizabeth Woods had briefed the trial court on the issue of ownership of the securities; the district court's judgment indicates that the judge adopted the Receiver's legal arguments. We agree with the district court's decision.

When the investors delivered their securities to Elliott with powers of attorney, title to the securities passed to Elliott. Florida law, adopting the Uniform Commercial Code, provides that

Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey.

Fla.Stat. § 678.301(1). The statute defines purchaser as anyone who "takes by sale, negotiation, pledge, gift, or any other voluntary action creating an interest in property." Fla.Stat. § 671.201(31) and (32). Thus, pursuant to their agreements with Elliott, the investors delivered their securities to Elliott and gave him the power to exercise dominion over them. This act transferred title.

Appellants argue that they "loaned" their securities to Elliott for the sole purpose of allowing him to misrepresent his wealth to his auditors. They also "loaned" the securities to Elliott so that they could receive a tax benefit. This apparently was the story that Elliott used to part the appellants from their securities. Regardless of the appellants' motivations in transferring the securities, the legal effect of their actions was a change in ownership. Thus, the appellants had no security interest in the securities they had transferred to Elliott.

■ The investors next argue that they are entitled to rescission of the agreements and restitution of the securities because the agreements were induced by fraud.[4] Elliott had sold many of the securities given to him, but he also kept many of them. These investor/appellants are attempting to recover the securities that Elliott retained with their names on them. Legally, these investors occupy the same position as the other investors whose securities were sold. All investors were defrauded. All investors were cleverly persuaded to part with their securities. The district court held

To allow any individual to elevate his position over that of other investors similarly "victimized" by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less.... [I]n the context of this receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy.

Order Establishing Final Plan, p. 3 ¶ 5 and p. 13 ¶ 35.

We cannot say that the district court abused its discretion by disallowing tracing. A district court has broad powers and

4. Appellants argued that the Receiver was committing the last act of the fraud by executing the powers of attorney over the securities; however, as discussed above, legal title to the securities passed to Elliott upon delivery, not upon execution of the powers. It is not fraudulent to exercise ownership rights over one's own property.

wide discretion to determine the appropriate relief in an equity receivership. *Safety Finance,* 674 F.2d at 372–373; *SEC v. Lincoln Thrift Association,* 577 F.2d 600, 606 (9th Cir.1978); *SEC v. Arkansas Loan & Thrift Corp.,* 427 F.2d 1171, 1172 (8th Cir. 1970) (applying an abuse of discretion standard).

The Supreme Court has recognized that, in equity, certain tracing rules should be suspended. *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924). In *Cunningham,* creditors argued that they were rescinding their contracts with Ponzi because of fraud. They attempted to use a tracing presumption to remove their money from a fund before other defrauded creditors could reach it. Although their money had been removed from the bank account, the creditors argued that if a fund is composed partly of the wrongdoer's money and the defrauded person's money, the court should presume the wrongdoer has removed his money and left the victim's money in the account. 265 U.S. at 12, 44 S.Ct. at 427. However, the Supreme Court recognized that the other money in the account belonged to other victims, not Ponzi, and that the use of this presumption would harm other victims. 265 U.S. at 13, 44 S.Ct. at 427. Moreover, since these creditors occupied the same legal position as other creditors, equity would not permit them a preference; for "equality is equity." *Id.*

The Receiver directs our attention to a case with similar facts to this one, but failed to indicate it was reversed by the Fourth Circuit one year before he wrote his brief. *Commodity Futures Trading Commission v. Franklin,* 652 F.Supp. 163 (W.D.Va.1986), *rev'd, Anderson v. Stephens,* 875 F.2d 76 (4th Cir.1989). Nevertheless, the Fourth Circuit did not reach the analysis of the district court that is relevant here. In *Commodity Futures,* the Commodities Futures Trading Commission obtained an order freezing Franklin's bank account and appointing a receiver to distribute the fund. 652 F.Supp. at 165. Subsequent to the freeze order, Franklin deposited $199,920 in checks that he had been carrying in his briefcase for several years. *Id.* After a receiver for the bank account had been appointed, the investors who had written the checks attempted to trace their checks into the fund. The district court disallowed tracing and divided the account pro rata among all investors. *Id.* at 168. In order to trace their checks, the investors would have to impose a constructive trust. Since this is an equitable remedy, the district court also applied the equitable rule of dividing the fund pro rata. Since all of the investors had been defrauded and occupied the same legal status, tracing was disallowed; and they would share in the fund proportionately to their lost investments. *Id.* at 168.

The Fourth Circuit reversed on narrow grounds, holding that the checks did not become part of the account because Franklin could not legally deposit them after the freeze order went into effect. 875 F.2d at 78. Thus, the Fourth Circuit did not reach the district court's equitable analysis, which we find to be convincing.

As all of the former securities owners occupied the same legal position, it would not be equitable to give some of them preferential treatment in equity. In fact, the equities weigh against allowing some to benefit from the fortuity that Elliott had not sold all of the securities. These appellants argue they loaned the securities to Elliott so that his net worth would appear to be greater in his books. As a mere loan would not increase net worth, these investors realized they were placing Elliott in the position of owner of the securities. Thus, they were confronted with facts bound to have made them aware they were helping Elliott defraud others.

■■■ Appellants next argue that their due process rights were violated by the district court's summary procedure for determining ownership of the securities. The appellants have failed to show how their rights would have been better protected by fuller proceedings. *Wencke,* 783 F.2d at 838. Although the district court determined ownership of the securities without a hearing, the facts surrounding the transfer of the securities were undisputed. Indeed,

the appellants acknowledged in a brief before the district court that a hearing on the facts would not be needed if the Receiver did not dispute the facts. The appellants never indicated to the district court what facts might be in dispute. With the loan agreements, the powers of attorney, and the parties' briefs on securities law before it, the district court decided ownership. Determining the ownership of securities based on documents is the type of decision that can appropriately be made without a hearing.

Appellants argue that summary proceedings can never be used to determine ownership of property. The Ninth Circuit wrote in dicta that a plenary action was required when a receiver attempted to obtain ownership of property held in a third party's possession. *Arizona Fuels*, 739 F.2d at 458–459. In the case before the Ninth Circuit, the case merely determined a right to possession, not title, so the dicta did not control. The following year, the continued vitality of this rule of law was shrouded in doubt when the Ninth Circuit permitted ownership of deeds of trust to be adjudicated in summary proceedings. *Universal Financial*, 760 F.2d at 1037.

*Arizona Fuels* did note an exception to the general rule when a third party was a party to the suit or was sufficiently involved in the receivership action. 739 F.2d at 459. Under these circumstances, summary proceedings are appropriate. Moreover, *Arizona Fuels* would appear to apply only when the property is in the third party's possession, not the receiver's. Here, the appellants' claims were intricately intertwined with the entire genesis of the receivership—Elliott's fraud—and the securities they claim were in the Receiver's possession.

However, whatever the continued vitality of the rule enunciated in *Arizona Fuels*, and despite the factual distinctions with the case before us, we hold that summary proceedings do not per se violate claimants' due process interest. Claimants must demonstrate how particular proceedings violate their due process rights and how fuller proceedings would better safeguard those rights. Appellants have failed to do so.

## V. SETOFF

Like the investors above, Adolph Hagstrom[5] entered into a buy/sell agreement whereby he sold Elliott eleven municipal bonds for $1,077,169.40; but, rather than paying in cash, Elliott executed a conditional sales agreement that would sell the securities back to Hagstrom in two years. The agreement required Elliott to pay 10.91% per year until Hagstrom repurchased the securities. Like all of Elliott's agreements, this agreement led Hagstrom to believe that he remained the owner of the bonds because the agreement indicated that Elliott was merely a custodian of the securities. However, relying on these documents and Hagstrom's delivery of the bonds, the district court found that Hagstrom had sold and therefore transferred legal title to the bonds. Thus, the district court found, and we do not disagree, that Hagstrom was an unsecured creditor for $1,077,169.40.

Approximately one year later, Hagstrom executed a series of promissory notes, borrowing money from Elliott. Five of the six notes stated that they were "secured by municipal bonds for which the lender is the custodian of the same." At the institution of the receivership, Elliott no longer had any of Hagstrom's bonds in his possession.

The Receiver brought an ancillary action to recover $280,000 due on the notes. Hagstrom counterclaimed for conversion of the bonds and asked for replevin. In addition, Hagstrom requested that the $280,000 debt be setoff by the million dollar debt the Receiver owed him.

At the Receiver's request, the district court stayed the ancillary action. The district court found that Hagstrom's counterclaims were the same claims he was asserting in the receivership proceeding. In addition, these claims were similar to those of

5. Hagstrom died during the proceedings, and the appellant is Leroy Moeller, as personal representative of the estate.

other claimants. The district court found that it was in the best interests of the receivership that the ancillary complaint and counterclaims be litigated in connection with the Receiver's Proposed Plan for Distribution of Assets.

Although Hagstrom protested that he would be deprived of an opportunity to present defenses to the $280,000 claim on his notes, Hagstrom complied with the order and filed his objections pursuant to the Proposed Plan. Hagstrom contends that the summary receivership proceeding did not safeguard his due process rights to his property; for without permitting Hagstrom discovery or an opportunity to present evidence on his claims and defenses, the district judge disallowed setoff and ruled that the loan was legitimate. We find that this summary process prejudiced Hagstrom's ability to defend his property in two ways. *Wencke*, 783 F.2d at 838. First, Hagstrom was unable to present evidence of the circumstances surrounding the loans. These circumstances are relevant when the court decides whether to permit setoff of the loan. Second, Hagstrom was unable to discover and present facts that might have amounted to a challenge to the validity of the loan itself.

The district court found that it would not be equitable to permit Hagstrom to setoff the debt owed him against the Receiver's claim, for it would create a preference for some creditors defrauded in the same way as other creditors, and Hagstrom owed a legitimate debt. The results for Hagstrom were disastrous. Setoff would have permitted Hagstrom to reduce the $1,077,169.40 owed him by his $280,000 debt. Hagstrom would then have been an unsecured creditor for $797,169.40. Of this amount, he would receive about 7 cents on the dollar. If setoff were disallowed, Hagstrom would recover approximately $70,000 of the one million under the Receiver's Plan. Then he would be sued for $280,000 in the ancillary action. Hagstrom would then be forced to pay approximately $210,000 even though he had been victimized to the extent of more than $1,000,000.

The district court's finding that setoff would create a preference is clearly erroneous. The right to setoff exists where there are mutual debts between parties. *Lowden v. Northwestern Nat'l Bank & Trust Co.*, 298 U.S. 160, 56 S.Ct. 696, 698, 80 L.Ed. 1114 (1936). The district court has discretion whether to allow a setoff against a receiver, and this decision will be overturned for an abuse of discretion. *In re Diplomat Electric Inc.*, 499 F.2d 342, 346 (5th Cir.1974); *Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1404 (6th Cir.1984). This discretion has, of course, limits and is governed by equity jurisprudence. *Diplomat*, 499 F.2d at 346. The district court must weigh the equities to determine whether to allow setoff. *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1169 (2d Cir.1979).

Recognizing a strong federal policy towards allowing setoff, the Second Circuit

> is reluctant to disturb this policy unless compelling circumstances require it. A decision disallowing a setoff must not be made cavalierly.

*Id.* at 1165. Likewise, other courts have recognized that there is practically a presumption in favor of allowing setoff. *In re Johnson*, 552 F.2d 1072, 1078 (4th Cir.1977) (setoff under the bankruptcy act is "surely permissive, if it is not compulsory"); *In re Williams*, 422 F.Supp. 342, 345 n. 4 (N.D.Ga.1976) ("In exceptional circumstances the court may deny altogether the right of setoff").

The burden is on the party moving to deny setoff to prove that setoff should be denied. In *Diplomat*, the Fifth Circuit noted that the bankruptcy trustee had failed to prove an affirmative defense to setoff. 499 F.2d at 345. The bankruptcy trustee had a judgment for defamation against a contract creditor. Arguing that a tortfeasor would benefit from his tort since he would, in a sense, recover more than similarly situated creditors, the trustee attempted to convince the Court that an exception to setoff should be made when a contract creditor has committed a tort. *Id.* at 346. However, recognizing that the creditor had a valid contract claim, this

Court held that the trustee had failed to show why an exception should be made. *Id.*

The Receiver argues that if Hagstrom is allowed a setoff, he will receive a preference over other creditors. While other creditors will only receive a percentage of their investments, Hagstrom would receive, up to $280,000, a dollar per dollar return on his investment.

The Receiver's argument has been rejected repeatedly for almost a century. As early as 1892, the United States Supreme Court recognized that if a debtor has a valid right to a setoff, it is not a preference. *Scott v. Armstrong*, 146 U.S. 499, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892). Despite having the effect of a preference, a setoff is a long-recognized right and is generally favored. *Cumberland Glass Mfg. Co. v. De Witt & Co.*, 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915); *In re Applied Logic Corp.*, 576 F.2d 952, 957 (2d Cir.1978); *Bohack*, 599 F.2d at 1165. Equity's general principle of equality among creditors is not an appropriate consideration when considering whether to grant setoff, which is itself equitable in origin. *Applied Logic*, 576 F.2d at 961; *Johnson*, 552 F.2d at 1079. Thus, if the Receiver is to prevail, he must do more than argue that Hagstrom is being treated better than other creditors.

A claimant is not treated better in the eyes of the law if the controlling facts surrounding his or her case lead to a different legal conclusion. To argue that all claimants should be treated similarly, without presenting facts, is an empty argument. One of the basic purposes of law and the courts is to determine which facts are legally relevant or irrelevant. If relevant facts differ, then the law will treat the claimants differently. Thus, it is incorrect to say the law prefers one claimant if that claimant's situation differs in a legally cognizable way. The court must examine Hagstrom's case individually to determine what type of treatment the law should accord him.

The Receiver argues that the special circumstances of mass fraud with hun-dreds of defrauded creditors require special rules, but this argument can only go so far. The cases of each creditor must be examined individually to determine the rights of that individual. The Receiver cannot, for the sake of expediency, group together claimants with different claims. The law recognizes a right to setoff, and courts are not "free to ignore [the setoff rule] when they think [its] application would be 'unjust.'" *Applied Logic*, 576 F.2d at 957. The Receiver fails to cite any cases which grant an exception to the setoff rule in a situation similar to this one.

Hagstrom next argues other ways he was prejudiced by the proceedings, but we find that only one of his arguments merits attention. Hagstrom argues that he deserved a hearing on who owned the bonds, but he did not point to any facts that were in dispute. As we noted with the other securities, the district judge, presented with the agreements, had all the evidence necessary to determine that ownership of the bonds had been transferred from Hagstrom to Elliott.

Hagstrom also wished to argue that Elliott converted the bonds and thus he is entitled to rescission and restitution of the bonds. Nearly all of the investors made this argument; but the district court properly found that since all investors were similarly situated, having been defrauded in the same way, and since most of the securities had been dissipated, no one should be permitted the remedies of tracing or restitution.

Hagstrom may be able to attack the loan agreement on the basis of fraud, but only on very narrow grounds. Hagstrom cannot argue that Elliott converted the bonds subject to the loan agreement; because Hagstrom had already transferred legal title to Elliott, and Elliott could not convert something he legally owned. A debtor can maintain a conversion action if the creditor seriously interferes with the debtor's ownership rights. *Chemical Sales Co. v. Diamond Chemical Co.*, 766 F.2d 364, 368 (8th Cir.1985). At the time of the formation of the loan agree-

ment, Hagstrom no longer had any ownership rights in the bonds.

 If there were any fraud involved in the loan agreement, it may have been fraud in the inducement. Hagstrom claims he did not know he no longer had title to the bonds when the loan agreement was made, and he argues he would not have accepted the "loan" if he had known his collateral did not exist. This is a factual issue that needs to be developed by the district court, for if Hagstrom's consent to the loan terms was secured by fraud, this is an affirmative defense. *See Turner v. Johnson & Johnson,* 809 F.2d 90, 95 (1st Cir.1986); *CBS, Inc. v. Merrick,* 716 F.2d 1292, 1296 (9th Cir.1983); *Baum v. Great Western Cities, Inc.,* 703 F.2d 1197, 1205–1206 (10th Cir. 1983); *Colorado Plasterers' Pension Fund v. Plasterers Unlimited, Inc.,* 655 F.Supp. 1184, 1186 (D.Colo.1987); *Scarsdale Nat'l Bank & Trust v. Toronto–Dominion Bank,* 533 F.Supp. 378, 385 (S.D.N.Y.1982). In addition, if the creditor has wrongfully or negligently interfered with the collateral, the debtor's obligation might be discharged. *United States v. Vahlco Corp.,* 800 F.2d 462, 465 (5th Cir. 1986) ("a guarantor is ... discharged if a creditor unjustifiably impairs any collateral securing a note by allowing it to be subordinated"); *Frederick v. United States,* 386 F.2d 481, 486 (5th Cir.1967) (if creditor negligently sells collateral for less than its full value, debtor is nevertheless permitted to offset full value). This line of cases recognized the injustice of enforcing an obligation on a debtor when the creditor was to blame for the insufficiency of the collateral to cover the debt.

The district court concluded in its Order that this was a legitimate loan, but we do not know how the district court arrived at this conclusion since it received no evidence and set out no finding of facts. If what Hagstrom alleges is true, the "loan" was merely part of a single scheme to defraud him of over a million dollars. Elliott had already stolen Hagstrom's bonds, but had to keep Hagstrom from becoming worried by paying him from time to time. This loan might have been a ruse to keep Hag-

strom from getting suspicious. If this turns out to be true, then the loan was not a simple, legitimate debt, but was part of Elliott's continuing fraud.

Hagstrom also argues it is ambiguous to which bonds the promissory notes are referring and wishes to offer evidence that it was the bonds of the buy/sell agreement. This point is relevant to Hagstrom's defense and should be allowed. If Hagstrom can show these notes referred to the buy/sell agreement bonds, it would support Hagstrom's argument of fraud. Although Hagstrom no longer had legal title to the bonds at this point, it is possible that Elliott convinced him that he retained title in order to secure the loan.

Determination of this factual issue will aid the district court in deciding whether Hagstrom owed a legitimate loan and whether to permit Hagstrom to setoff this $280,000 against the $1,077,169.40 owed him by the Receiver. Even if the district court determines that Hagstrom has not proven his defense of fraud, the district court should still consider the circumstances of the loan when deciding whether to deny setoff. If the loan was an essential part of Elliott's continuing efforts to defraud Hagstrom, then it cannot easily be separated from Hagstrom's claim against the receivership by calling it a legitimate loan.

Although claimants were not permitted to trace into the receivership based on equitable theories of fraud, it is appropriate to permit Hagstrom to raise the defense of fraud. In Hagstrom's case, the Receiver is reaching out to pull money into the fund. This is quite a different situation from that of the other claimants. The other claimants were not permitted to trace into the receivership because they were all defrauded in the same way, and the remaining funds were insufficient to cover their claims. The other claimants were not permitted to use fraud as a sword to trace assets when the assets were dissipated, while Hagstrom is using fraud as a shield to prevent further financial damage to himself. It would be difficult for equity to permit the Receiver to bring money into

the receivership from someone who was defrauded by Elliott. In effect, equity would be sanctioning further torment of a defrauded investor.

If Elliott, himself, had sued Hagstrom for the notes, it is probable that Hagstrom would have defeated the claim because of Elliott's fraud. That the Receiver, instead of Elliott, brought the claim should have little effect. Letting the permissibility of a defense turn on who the plaintiff is demands much of a court of equity. It is true that a receivership has different concerns than a typical debtor-creditor relationship. Nevertheless, traditional notions of equity still control. As it is often stated, "he or she who comes into equity must come with clean hands." *Pinion v. Dow Chemical*, 928 F.2d 1522, 1537 (11th Cir. 1991). While the Receiver committed no wrong, it stretches credulity to allow it to recover a sum based on fraud. It is one thing to disallow tracing against the receivership despite fraud, it is quite another thing to permit the Receiver affirmatively to obtain money from a third-party when that party's obligation has been obtained and created by fraud.

■ Hagstrom must be permitted to explore these facts in a single proceeding, for the estoppel effect of the district court's decision in the receivership on the ancillary proceeding is not clear. The Receiver conceded at oral argument that Hagstrom would be collaterally barred from raising defenses in the ancillary proceeding once the district court ruled on those defenses in its Final Order, but it is not obvious which issues the district court decided in its Final Order. In its order staying the ancillary proceeding, the district court indicated it would rule on the complaint and counterclaims, yet the Final Order does not require Hagstrom to pay the $280,000. The district court merely found that the loan was legitimate and that setoff was disallowed. Presumably the Receiver could now reactivate the ancillary proceedings to collect the loan. Hagstrom would be collaterally barred from claiming setoff and conversion since the district court found Hagstrom had transferred legal title to the bonds.

Hagstrom argues that the district court failed to consider that Elliott converted the bonds—the collateral for the loan—when it decided to disallow setoff. As we noted above, Hagstrom cannot argue conversion as a defense. However, since Hagstrom never had an opportunity to discover exactly what Elliott did before the district court entered its Final Order, we construe conversion broadly to cover general fraud. Fraud is a factor the district court should consider when analyzing setoff, and fraud is a complete defense to a suit on the $280,000 notes. Since fraud as a defense to the loan was not litigated in the summary proceeding, Hagstrom could raise it as a defense in the ancillary action. However, since the district court must also analyze the fraud when deciding whether to permit a setoff, it would be more efficient to consolidate the issues in one proceeding. Because of possible problems of collateral estoppel, if Hagstrom is to get his day in court, it must be within the summary receivership proceedings.

The district court's finding that a setoff would create a preference was error. On remand, when reweighing the equities to determine whether to permit setoff, the district court should consider the circumstances of the loan. In addition, Hagstrom should be provided a meaningful opportunity to argue fraud as a defense to the loan.

## VI. ADMINISTRATIVE TRANSFER

■ The appellants also challenge the district court's jurisdiction to enter the Order Establishing Final Plan. At one point in the proceedings, the Chief Judge of the Southern District of Florida entered an administrative order transferring the case to the Middle District of Florida pursuant to the Judicial Improvements and Access to Justice Act, 28 U.S.C. § 89. The record does not show whether the file was actually transferred, but the parties continued to file pleadings in the Southern District, and Judge William M. Hoeveler entered the Order Establishing Final Plan. Meanwhile, Judge Hoeveler and the Chief Judges of the Southern and Middle Districts decided it would be better to keep the case in the

Southern District. *Nunc pro tunc* orders were issued retransferring the case to the Southern District and purported to retain jurisdiction in the Southern District so that Judge Hoevler could enter the Final Order.

Although much was made of this procedure on appeal, none of the parties point to any harm they suffered as a result. As none of the parties' substantive or procedural rights were violated, and the transfers turned out to be mere ministerial acts, we find that no reversible error took place.

## VII. ADMINISTRATIVE FEE

Melvin Burkhardt, Rose Ella Burkhardt, Albert C. Neil, Howard Dore, Ruth Dore, Gerald J. Braun, Christie Braun, and Monica Brooke Braun challenge the district court's order granting fees to the Receiver. These appellants were ultimately determined to be secured creditors in securities that they and a third party, Vault Systems, possessed. The district court ordered these secured creditors to pay the lesser of 10% of the value of the securities or 10% of the gross proceeds from the sale of the securities. This administrative fee was designed to reimburse the Receiver for his work for the receivership. The district court found that it would be inequitable for the burden of the receivership to fall solely on the unsecured investors since the secured investors had substantially benefitted from the Receiver's work.

The appellants argue, first, that the secured creditors should not pay any of the Receiver's expenses. Second, if the secured creditors should pay part of the expenses, the 10% figure does not accurately represent the amount of work the Receiver did on the secured creditors' behalf. Third, the district court erred in levying the administrative fee on some creditors but not others.

The district court appointing the receiver has discretion over who will pay the costs of the receiver. *Bowersock Mills & Power Co. v. Joyce,* 101 F.2d 1000, 1003 (8th Cir.1939). It is appropriate and obvious that a receiver will make expenditures to maintain trust property. *Union Trust Co. v. Illinois M.R. Co.,* 117 U.S.

434, 456, 6 S.Ct. 809, 821, 29 L.Ed. 963 (1886). The court in equity may award the receiver fees from property securing a claim if the receiver's acts have benefitted that property. *Bank of Commerce & Trust Co. v. Hood,* 65 F.2d 281, 283 (5th Cir.1933); *South County Sand & Gravel Co. v. Bituminous Pavers Co.,* 108 R.I. 239, 274 A.2d 427, 430 (1971); *In re Loop Hospital Partnership,* 50 B.R. 565, 571 (Bankr.N.D.Ill.1985) (noting that the court's equitable powers permit it to grant fees to a bankruptcy trustee); *Clark on Receivers* § 641 (3d ed. 1959) ("property which is benefitted by the receivership should bear its share of the costs and expenses of the receivership including receiver's fees"). Other courts have also held that it is appropriate for a receiver to be paid from the proceeds of secured property if the receiver has benefitted that property. *Knickerbocker Trust Co. v. Green Bay Phosphate Co.,* 62 Fla. 519, 56 So. 699 (1911); *Schreiber v. Ditch Road Investors,* 164 Cal.Rptr. 633, 636, 105 Cal.App.3d 675 (Cal.Ct.App.1980) (real estate taxes were properly paid by receiver as an expense of the receiver).

Some courts have held that the receiver's right to payment is created by the creditors' implied consent or acquiescence in the receivership proceedings. *Knickerbocker,* 56 So. at 699. Perhaps it is more accurate to say there is an

> implied understanding that the court which appointed him and whose officer he is will protect his right to be paid for his services, to be reimbursed for his proper costs and expenses.

*South County,* 274 A.2d at 430. Or simply, those who benefit from a receivership should pay for that benefit. *Lowder v. All Star Mills,* 85 N.C.App. 329, 332, 354 S.E.2d 765, 766 (N.C.Ct.App.1987), *cert. denied,* 320 N.C. 169, 357 S.E.2d 926 (1987).

Although it is appropriate to charge a secured creditor for maintenance of the collateral, it is sometimes difficult to ascertain what type of benefits a receiver has bestowed on receivership property. In most cases, the benefit is easy to determine, such as when the receiver pays taxes

on the property; *Schreiber,* 164 Cal.Rptr. at 636; or when the corpus of the receivership is a business that the receiver must run. *Union Trust,* 117 U.S. at 434, 6 S.Ct. at 809 (discussion of expenses of running a railroad); *South County,* 274 A.2d at 430 (appropriate to charge the receiver's expenses in collecting accounts receivable to the trust company which had a security interest in the accounts receivable); *Lowder,* 85 N.C.App. at 332, 354 S.E.2d at 767 (receiver managed six corporations). Sometimes the benefit may be more difficult to determine.

■■■ The appellants argue that the Receiver is an adverse party and all of his work was to deprive the appellants of their secured interest. This is not exactly true, for the Receiver is an officer of the court. *FSLIC v. PSL Realty Co.,* 630 F.2d 515, 521 (7th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *United States v. Smallwood,* 443 F.2d 535, 539 (8th Cir.1971), *cert. denied,* 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93 (1971). Even though the Receiver may at times take adverse positions to certain claimants, the Receiver acts under supervision of the court, *id.;* for the court must independently approve the Receiver's legal and factual findings. *Morrison–Knudsen Co., Inc. v. CHG Int'l, Inc.,* 811 F.2d 1209, 1218 (9th Cir.1987), *vacated on other grounds,* 490 U.S. 1001, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989).

■■■ The appellants contend that the Receiver did not confer any benefit on them. A third party and the appellants were in possession of their securities, and the Receiver did not pay any expenses for the maintenance of these securities. However, a benefit to a secured party may take more subtle forms than a bare increase in monetary value. Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation. *Donovan v. Robbins,* 588 F.Supp. 1268, 1273 (N.D.Ill.1984) (the district court awarded the receiver a fee simply for determining how much money to release to a creditor). Whether a receiver merits a fee is based on the circumstances surrounding the receivership, and "results are always relevant." *SEC v. Moody,* 374 F.Supp. 465 (S.D.Tex.1974), *aff'd,* 519 F.2d 1087 (5th Cir.1975).

■■■ The district court found that the secured creditors had participated in, and enjoyed the fruits of, the receivership and should bear a portion of the administrative expenses. As a result of substantial work, the Receiver established the appellants' perfected security interest in the collateral. Part of Elliott's fraud was convincing investors they were collateralized when they really were not. Often, Elliott attempted to use the same securities as collateral for several different investors. The Receiver spent a majority of his time cutting through this web to determine who really was entitled to the collateral. In some cases, the Receiver brought lawsuits defeating other investors' claims to the collateral at issue here, thus perfecting the appellants' security interest.

Generally, a receiver is nothing more than an opponent of one who claims secured status, but this scenario envisions only a one-on-one contest. In this case, the Receiver opposed many competing claims of secured status to the same property. Although the prevailing secured claimant had to fight the Receiver's opposition to his claim, he reaped benefits when the Receiver defeated competing claims. By combatting competing claims, the Receiver became his ally. We find that, with these type of activities, the Receiver conferred a benefit on the secured creditors and merits fees from their collateral.

■■■ However, we disapprove the method used to arrive at the 10% figure. In his Proposed Plan, the Receiver stated that his accountants had estimated the total projected administrative expenses and fixed the proportionate amount of expenses attributable to each secured claim. In its Order Establishing Final Plan, the district court awarded the 10% fee, finding

the secured claimants represent approximately ten percent (10%) of the total

number of claims filed (1,704 claims and 174 secured) and represent an even larger portion of the gross proceeds. Based on these facts and the Court's own observation on the amount of time expended on the secured investors' claims, the court finds it entirely reasonable and equitable to require each secured investor [to pay 10%].

We hold that merely counting heads is not an equitable way to divide the burden of the receivership. Secured creditors should only be charged for the benefit they actually receive. That their claims represented a large portion of the gross proceeds does not necessarily mean the Receiver spent an equally proportionate amount of time on their claims.

■ Apportioning the burden of the receivership between secured and unsecured creditors is permissible when the benefits cannot be accurately divided between the two. *Hood*, 65 F.2d at 283. On the other hand, when services benefit solely unsecured property, only that property is liable for the costs. *Id. E.g., Clark on Receivers* § 641 (3d ed. 1959). In *Hood*, the Receiver administered two funds—mortgaged property and general assets. *Id.* The Fifth Circuit requested a fuller and more accurate inquiry into the services the receiver provided to each fund so that those expenses could be allocated to each fund. *Id.* at 284.

We vacate the district court's order granting the 10% administrative fees and remand for a fuller and more accurate inquiry into the services the Receiver provided to these secured creditors who appealed this issue.[6] As we noted above, time spent disentangling the Elliott's paper trail is relevant, as is time combatting other creditors lawsuits. Time spent in preparing his Proposed Plan with regard to these secured creditors is also relevant.

■ These secured investors are not liable for the Receiver's time spent on activities adverse to them, for these activities benefitted the unsecured creditors. *South County*, 274 A.2d at 430. These adverse

activities include time the Receiver spent opposing their claims to be secured, their objections to the administrative fees, and their appeal to this Court.

■ The Receiver argues it would have been unduly burdensome for him to maintain cost records for each asset, but presumably the Receiver kept records which he presented to the district court when he requested fees. A mere burden in record keeping is not a sufficient reason for requiring creditors to pay for work that did not benefit them. However, we do not direct the district court to perform the impossible. For some of the Receiver's work, the district court may find that it benefitted the unsecured and the secured equally or that it is impossible to allocate accurately the expense between the two. For this work, the district court shall allocate the cost between the secured and unsecured creditors on the best basis it can determine. *Hood*, 65 F.2d at 283; *Lowder*, 354 S.E.2d at 767, 85 N.C.App. at 332–333. What is required is that an earnest effort be made to devise a method of allocating the actual costs of the receivership to specific assets and that the order on remand disclose the results of this effort.

■ The secured creditors in this appeal also challenge the district court's refusal to charge two banks an administrative fee for processing their collateral. While the district court found that the Receiver spent minimal time determining that these bank loans were collateralized, the district court found that the Receiver provided substantial work for the appellants. This finding of fact justifies the district court's distinguishing between the two types of creditors. *See Hood*, 65 F.2d at 283. The district court's finding is not clearly erroneous. *American Nat'l Bank v. FDIC*, 710 F.2d 1528 (11th Cir.1983).

## VIII. COLLATERAL LOAN AGREEMENT

In 1985, appellants Kenneth J. and Linda J. Davis approached Phillip Elliott with ap-

---

**6.** We express no opinion on whether 10% is, as appellants contend, an exorbitant fee. It may well be that the secured creditors actually received this large a benefit.

proximately $220,000, intending to pay off the mortgage that Elliott held on the Davis home. At Elliott's suggestion, however, Davis and Elliott entered into a "Collateral Loan Agreement" whereby, instead of satisfying the mortgage at that time, Davis invested the $220,000 in Elliott's Sixteen Percent Tax Certificate Program. Elliott "secured" the investment by personally executing a Satisfaction of Mortgage on the Davis home. The Satisfaction of Mortgage document was held by Davis as collateral for the loan and was not then filed for record. Under the terms of the Collateral Loan Agreement, it was agreed that Davis would not file the Satisfaction of Mortgage unless and until Elliott was ten days late in making a scheduled "payment" on the "loan".

Unknown to Davis, one month prior to signing the Collateral Loan Agreement, Elliott had assigned and recorded an assignment of the mortgage on the Davis home from Elliott to Elliott Realty Corporation.

In April of 1987, Elliott's monthly check to appellant failed to clear the bank. On that same day, appellant learned through the newspaper that Elliott's businesses, Elliott Enterprises and Elliott Mortgage Company, had been closed by a court order and a Receiver appointed. That court order prohibited anyone from taking action adversely affecting any economic interest of Elliott. Four days later, Davis filed the Satisfaction of Mortgage. Davis' attorney began efforts to clear the title to the Davis home, and it was then that Davis learned that the mortgage had been transferred to Elliott Mortgage Company, thereby creating a cloud on the title to the home since the Satisfaction of Mortgage had been executed by Elliott personally.

In April of 1988, after a dialogue between Davis' attorney and Receiver Farrar and his attorney, Davis secured a buyer for his home. Farrar then informed Davis of his intention to classify the $220,000 loan as unsecured.[7] In order to allow Davis to convey marketable title to the buyer, Farrar agreed to clear the title to the Davis home upon the condition that Davis place the principal and interest due on the mortgage—roughly $250,000—into an escrow account. Disposition of the escrow funds was dependant upon the district court's resolution of whether the Collateral Loan Agreement was a secured transaction.

Davis deposited the $250,000 into an escrow account and filed with the district court an emergency motion to intervene, requesting an early hearing and a court order directing the escrow agent and Farrar to pay the escrow funds to Davis.

In July of 1988, Davis' motion to intervene was granted and a hearing was held in the district court. At the hearing, the Receiver took the position that the loan was unsecured because Davis failed to take possession of the note on his house (or have an agent do so) and failed to file a financing statement with the Secretary of State. The district court observed that the question of whether Davis' collateralized loan to Elliott was secured presented an interesting question. The court stated that it would take the matter under advisement and render a decision. No order was ever issued directly responding to Davis' specific arguments or ruling upon whether the collateralized loan was secured. Rather, the district court's Order Establishing the Final Plan classified the collateralized loan as unsecured and ordered the escrow funds to be released to the Receiver. It is from this Order that Appellant brings this appeal.

Davis claims three errors of law in the district court's Order Establishing Final Plan for Distribution of Assets. Specifically, Appellant claims that (1) The Collateralized Loan Agreement between Elliott and Davis was a secured loan agreement under Florida law and was a secured claim against the assets of the receivership; (2) The Receiver exceeded his authority by re-

---

7. As originally stated, the Receiver's classification of the loan as unsecured was based upon the fact that the recordation of the satisfaction was premature under the original collateral loan agreement and had violated the district court's order prohibiting actions adverse to Elliott's financial affairs. As explained below, this position was clarified at the hearing before the district court.

fusing to provide Davis with a clear title on the Davis home unless Davis funded the $250,000 escrow account; and (3) The district court erred in ordering the escrow agent to pay to the Receiver the proceeds of the escrow account.

 Upon the basis of the district court's categorization of Davis' claim in the Final Order and the order directing that the escrow funds be paid to the Receiver, we must assume the court rejected Davis' arguments that the collateralized loan was secured under Florida law. The district court's reasoning behind this conclusion is not on record.

The material facts are not in dispute. Appellant claims only error of law and thus our standard of review is plenary. *See Cathbake Inv. Co. v. Fisk Electric Co.,* 700 F.2d 654, 656 (11th Cir.1983).

Appellant claims secured status in the collateral Satisfaction of Mortgage at the time the Receiver was appointed. That the underlying mortgage is not subject to Article 9 of the U.C.C. is clear. *See* Fla.Stat. § 679.104(j). What is unclear and must be resolved here is whether Article 9 is applicable to the Collateral Loan Agreement.

A number of transactions that touch upon real estate are still within the scope of Article 9. *See* Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 1.08(10)(a). One such transaction is where a debtor pledges a real estate mortgage note as collateral for a loan. The note is an instrument covered under Article 9 even though the underlying mortgage remains unaffected by the U.C.C. *See In re Maryville Savings & Loan Corp.,* 760 F.2d 119 (6th Cir.1985). The application of Article 9 to a secured transaction is not affected where the obligation is itself secured by a transaction to which Article 9 does not apply. *See* Fla. Stat. § 679.102(3).

The dynamics of this dual tiered principal may be best exemplified by the Official Comment:

> The owner of Blackacre borrows $10,000 from his neighbor and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage.

Fla.Stat. § 679.102, Uniform Commercial Code Comment 4.

It is apparent that the drafters of the U.C.C. intended for Article 9 to apply to the creation of a security interest in a note secured by real estate. We are presented with such a situation here. Article 9 applies to the collateralized loan and pledge of security even though the underlying obligation, here the mortgage, is not within the scope of the U.C.C. Elliott, mortgagee to Davis, pledged the note on Davis' home as security for Davis' loan, as a creditor, in the amount of the mortgage owed to Elliott. Davis, as a mortgagor, has no claim to U.C.C. application. However, Davis stands before us not as a mortgagor, but as a creditor under the terms of the Collateralized Loan Agreement. In short, Davis stands in the shoes of "X" in the above hypothetical. The fact that Davis is a mortgagor in a different context does not affect his status as a creditor in making the loan to Elliott. According to the official comment, Davis has a security interest in an instrument via a pledge, and Article 9 will determine whether Davis's interest was a secured transaction.

 The perfection requirements of Article 9 require that in order to perfect a security interest in an instrument, the creditor must have possession of the instrument itself. Fla.Stat. § 679.304(1). This can be accomplished by having an agent or a bailee take possession of the instrument. *Id.* 679.305, Uniform Commercial Code Comment (1972 revision). Davis claims that his possession of the Satisfaction of Mortgage executed by Elliott satisfies this requirement and confers secured status upon Davis. We disagree.

Article 9 defines an instrument as "a negotiable instrument, or a certificated security or any other writing which evidences a right to the payment of money ... which is in [the] ordinary course of business transferred by delivery with any necessary indorsement or assignment." Fla.Stat. § 679.105(i). By this definition, the Satisfaction is not an instrument. The Satisfaction of Mortgage is merely a document that, when filed, provides notice to others that the mortgage has been paid off. It is apparent, however, that the note itself does fit the U.C.C. definition of an instrument.

Second, in order for a security interest to attach, the debtor must have rights in the collateral. Fla.Stat. § 679.203(1)(c). It cannot be said that Elliott had rights in the Satisfaction of Mortgage sufficient to convey a security interest. Elliott's rights vested in the note, which was in turn secured by the mortgage. By executing the Satisfaction under the Collateral Loan Agreement, Elliott may have conditionally relinquished some of his right to payment under the note, but the fact remains that Elliott had no actual rights in the Satisfaction of Mortgage.

Elliott's rights were in the note, an instrument as defined by the U.C.C., and the mortgage that secured the note. Likewise, Davis' security interest in the event Elliott defaulted on Davis' loan vested in the note. When Elliott failed to make the scheduled payment, Davis sought to clear the note by filing the Satisfaction. In order for Davis to perfect his security interest under Article 9, he had to take possession of the note. Yet Elliott retained possession of the note and mortgage at all times.

Our conclusion is bolstered by the leading case on the matter, *In re Maryville Savings & Loan Corp.*, 743 F.2d 413 (6th Cir.1984). In that case, the Sixth Circuit held that in order for a bank making a loan to a savings and loan association to perfect a security interest in the debtor's inventory of mortgages, the bank must take possession of the notes secured by the mortgages. *Id.* at 416-17. Likewise, in order for Davis to perfect a security interest in the mortgage held by Elliott, Davis had to take possession of the note.

Our conclusion also serves the public interest Article 9 seeks to protect. The danger of leaving Elliott in possession of the note while claiming a secured interest in it is evident to all the investors who relied upon Elliott's misrepresentations regarding his real estate holdings. So long as Elliott had possession of the note, he was free to assign it to Elliott Mortgage Company and use it to induce future investors who had no way of knowing of the security interest claimed by Davis. Because Elliott had possession of the note, these investors were subject to being persuaded that the company owned substantial, unencumbered assets comprised of notes and mortgages like the ones at issue here. Had Davis taken possession of the note, or had an agent or bailee do so, future investors could request evidence of Elliott that he actually held the note that he claimed as security. As it was, Elliott was free to make his misrepresentations and appear to substantiate them because he actually held the note.

The district court's classification of the Davis' claim as unsecured is affirmed. Accordingly, we rule that the Receiver did not exceed his authority in refusing to provide Davis with a clear title to the Davis home unless Davis funded the escrow account and find no error in the district court's order that the escrow agent pay to the Receiver the escrow funds.

## IX. VICKREY PAINTING COLLECTION

Seaton and Josephine McDaniel and Sid and Trudy Kleiner appeal from the district court's order finding they had failed to perfect a security interest in the Vickrey Painting Collection. Elliott had purchased this collection for $350,000 and arranged for it to make a nationwide tour. Independent appraisers estimated that, upon completion of the tour, the paintings would be worth between $450,000 and $600,000. The Kleiners and McDaniels entered contracts with Elliott whereby they purchased a percentage interest in the paintings with the option to demand that Elliott buy their

interest back in two years. The district court construed this contract as a loan by the appellants to Elliott secured either by a collateral interest in the proceeds from the sale of the paintings or by a collateral interest in the paintings themselves. If the interest were in the proceeds, it would be an interest in a general intangible that could only be perfected by filing a financing statement. Fla.Stat. § 679.302, § 679.-106. If the security interest were in the paintings themselves, this interest could only be perfected by actual possession by the investors or constructively through their bailee. Fla.Stat. §§ 679.304, 679.305. If the interest created by the contract is a security interest, then the appellants have failed to perfect their interest by filing or showing a bailment. We find that the district court erred in construing the contract as a loan agreement and reverse; for by contract, the appellants obtained an ownership interest in the paintings.

The Kleiners and McDaniels prosecuted this appeal pro se, and as they admit in their briefs, they were not very aware of the legal alternatives open to them. It appears that early during the receivership proceedings, the Receiver convinced them that they needed to have filed a financing statement or to have proved a bailment in order to perfect an interest in the collection; thus, the appellants pursued the issues as the Receiver had framed them and argued that they had made a timely filing and had constructive possession of the paintings. On appeal, the Kleiners and McDaniels did not directly raise the issue that they held an ownership interest, not a security interest, in the Vickrey Collection; but from a fair reading of their briefs and their objections to the district court, it is clear they were arguing they owned a portion of the paintings.

■ This Court provides pro se parties wide latitude when construing their pleadings and papers. *Maldonado v. Garza,* 579 F.2d 338, 340 (5th Cir.1978); *United States ex rel. Simmons v. Zibilich,* 542 F.2d 259, 260 (5th Cir.1976). When interpreting the pro se papers, the Court should use common sense to determine what relief the party desires. *Simmons,* 542 F.2d at 260.

■ The appellants did not understand the difference between having an ownership interest and a security interest; but they did understand that a percentage of the paintings belonged to them. When the appellants filed their objections to the Receiver's Proposed Plan, they questioned why they should be required to file a financing statement in connection with their purchase of paintings when a statement was not required for the purchase of a boat or car. In their briefs, the Kleiners claim their contract made then a "2.903% owner," and the McDaniels claim their contract made them a "10% owner." In their reply brief, when construing the term "beneficial interest" in their contract, the appellants write, "To the appellants, this is clearly an ownership of [a percentage] of this property." Thus, although the appellants may not have known how to argue that they had legal title to an undivided interest in the paintings, their briefs and objections demonstrate they are asserting an ownership interest. The fact that they undertook to argue that they had satisfied what they understood to have been the Receiver's unreasonable objections—filing a financing statement or proving bailment—does not constitute acquiescence to the Receiver's contention that their interest was as security holders.

■ The interpretation of a contract is a question of law subject to de novo review on appeal. *Stinson, Lyons, Gerlin & Bustamante v. Brickell Bldg. 1 Holding Co., Inc.,* 923 F.2d 810, 813 (11th Cir.1991); *Sweeney v. Athens Regional Medical Center,* 917 F.2d 1560, 1564 (11th Cir.1990). Since the contracts are the only evidence, and the validity of the contracts is not in dispute, we may proceed to decide the legal effect of the contracts. *United States v. Grayson County State Bank,* 656 F.2d 1070, 1075 (5th Cir.1981).

■ The contract entered into by the Kleiners is exactly the same as the McDaniels, except the percentage ownership inter-

est is different.[8] The district court erred in construing this as a loan agreement. By the contract terms, the parties purchased a percentage share of the painting collection. The contract gives the appellants the option to force Elliott to buy back their shares, but Elliott does not have the right to force the appellants to sell.

Perhaps if Elliott had retained the right to demand to buy back the appellants' interests, this document could be construed as a loan. *See, e.g., Hembree v. Bradley*, 528 So.2d 116, 118 (Fla.Dist.Ct.App.1988) (loan was disguised as a contract for sale and repurchase of real property).[9] In *Hembree*, the seller retained the right to buy back the property. *Id.* This demonstrated that the buyer was merely loaning the seller money, and the land was used as collateral for the loan. *Id.* at 116.

Elliott, the seller, did not retain the right to demand to buy back the percentage shares in the paintings; thus, he had no rights in the property. The appellants could opt to have Elliott buy back the shares, but this option does not deprive them of ownership of the shares until they exercise the option. These types of options are commonplace. *See, e.g., United States v. Netterville*, 553 F.2d 903, 911 (5th Cir. 1977).

The McDaniels and Kleiners are owners of the collection in the percentages dictated by their contracts. The district court's order finding that they held an unperfected security interest in the paintings is reversed.

## X. TAX CERTIFICATES

A certification of the tax certificates to the Florida Supreme Court will be issued separately. *See SEC v. Elliott*, 953 F.2d 1556 (11th Cir.1992). The Court and this panel retain jurisdiction over this single issue to complete the opinion and judgment when the Florida Supreme Court responds if it elects to accept the question and respond to it. *See generally Insurance Co. of North America v. Lexow*, 937 F.2d 569 (11th Cir.1991) (affirming in part and certifying one question to the Florida Supreme Court); *Jordan v. National Accident Insurance Underwriters Inc.*, 922 F.2d 732 (11th Cir.1991) (affirming in part and certifying a question to the Alabama Supreme Court); *Lohr v. State of Florida Department of Corrections*, 835 F.2d 1404 (11th Cir.1988) (affirming part of the district court's judgment and certifying question), *certifying question*, 835 F.2d 1402 (11th Cir.1988), *affirming the district court after the Florida Supreme Court answered the question in the negative*, 869 F.2d 1456 (11th Cir.1989).

## XI. CONCLUSION

One thousand eight hundred and ninety (1890) claims were filed by one thousand sixty-two (1,062) claimants. This was not an easy receivership to administer, for part of Elliott's con was to create a paper trail that made claimants believe they were secured when in fact they were not. Many of the claimants were understandably angry with Elliott, but often this anger was misdirected towards the Receiver and the district court.

---

**8.** The relevant parts of the contract read
I, Phillip Elliott, acknowledge receipt of a check in the amount of $34,449.20 from Mr. and Mrs. Seaton F. McDaniel for a pro rata share of the Elliott Collection # 1 of Robert Vickrey Paintings pursuant to a letter offer of January 15, 1986, from the syndicator, Phillip Elliott.
A beneficial interest in the entire collection equal to 10% of the $344,490.20 which is the cost of the Collection to Elliott, on the sale of the collection at market, the beneficial owners, Mr. & Mrs. Seaton F. McDaniel, will be entitled to 10% of the net proceeds.
Anticipated sell out of the Elliott Collection is two years. Beneficial owner has the option either to 1) demand a refund of the principal sum of $34,449.20 together with accrued interest thereon at the rate of 11% per annum two years from the date hereof; or 2) to remain in the joint venture deal with Phillip Elliott until the collection is sold.

**9.** Courts have often looked behind the structure of a deal to find that the deal was actually a secured transaction. *See FMA Financial Corp. v. Pro–Printers*, 590 P.2d 803, 25 U.C.C.Rep. 950 (Utah 1979) (lease of personal property with option to purchase was actually a secured sale under Article 9).

In this context, the Receiver and subsequently the district court were called upon to distribute the remains of Elliott's assets. In the end, of the many claimants, only twenty-seven claimants appealed on ten issues, of which we reverse four. In the hope that this long receivership will come to an end, we dealt with those issues as follows.

The district court properly retained jurisdiction to enter its final order.

The district court's finding that the investors had transferred legal title to their securities is AFFIRMED. The district court's disallowance of the remedies of tracing, rescission and restitution is AFFIRMED.

The district court's denial of Hagstrom's claim to setoff is REVERSED and REMANDED for further findings consistent with this opinion.

We REVERSE the district court's order to set aside the transfer to the Schutzmans and REMAND for further factual findings on the nature of the transfer and the Schutzmans' affirmative defenses.

The district court's order that secured creditors should pay an administrative fee is AFFIRMED, but the fee awarded against these creditors is VACATED and REMANDED for more accurate findings of the actual value of the Receiver's services to the secured creditors.

Because the Davis' failed to perfect their security interest in the mortgage note, the district court's classification of their claim as unsecured is AFFIRMED.

We REVERSE the district court's finding that appellants failed to perfect a security interest in the Vickrey Painting Collection. We direct the district court to enter judgment in favor of the Kleiners and the McDaniels.

The question of whether Florida tax certificates are interest in land for purposes of Article 9 of the Uniform Commercial Code is certified to the Florida Supreme Court.

As to all other issues, the judgment of the district court is AFFIRMED.

We AFFIRM in part, REVERSE in part, and REMAND to the district court for further proceedings consistent with this opinion except as to the single issue which we CERTIFY to the Florida Supreme Court. The clerk is directed to enter judgment and to issue the mandate on all claims except that issue certified of which we retain jurisdiction until a response has been received from the Florida Supreme Court and until this court has taken appropriate action based upon that response.