COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

Warren R. FRANKLIN a/k/a Ricky Franklin, d/b/a Futures Investment Group, Defendant.

Civ. A. No. 86–0032.

United States District Court,
W.D. Virginia,
Danville Division.

Nov. 12, 1986.

Steven W. Widerman, Commodity Futures Trading Com'n, Washington, D.C., John P. Alderman, U.S. Atty., Roanoke, Va., Randy W. Sinclair, Fowler, Sinclair & Hurd, Danville, Va., for plaintiff.

James P. Kent, Jr., Kent & Kent, Altavista, Va., Paul J. Pantano, Jr., Metzger, Shadyac & Schwarz, Washington, D.C., for defendant.

## AMENDED MEMORANDUM OPINION

TURK, Chief Judge.

This case arises under the Commodity Exchange Act ("the Act"), 7 U.S.C. § 1 *et seq.* 1982. The present dispute centers on the Receiver's proposed plan for distributing the remaining funds of 161 investors which have been kept in an insured receivership account. *See* Receiver's First Interim Report ("Report").

On September 3, 1986, the court entered a memorandum opinion and order, 643 F.Supp. 386, accepting in part and rejecting in part the Receiver's Proposed Order of Distribution. Subsequently, on September 17, 1986, the Receiver moved for the court to reconsider its decision concerning the proposed distribution plan. Specifically, the Receiver urges the court to reconsider the arithmetical formula incorporated in the original order. *See CFTC v. Franklin,* 643 F.Supp. 386, 390 (W.D.Va.1986). The receiver argues that the court has misconstrued the language of the Receiver's First

Interim Report and has adopted a distribution formula that will result in a less equitable distribution than the one anticipated by the Receiver. In a motion filed on September 17, 1986, the plaintiff Commodity Futures Trading Commission ("CFTC") concurred in the Receiver's motion. On September 24, 1986, the court granted the Receiver's motion to reconsider and vacated the previous order and opinion. The court now enters this amended opinion and accompanying order to further clarify its position as to the proposed distribution formula. The court has jurisdiction of this case pursuant to 7 U.S.C. § 13a–1 (1982).

All interested parties were permitted to voice any objections to the plan at a July 30, 1986, hearing. Neither the Receiver nor the plaintiff requested a hearing in connection with the motion for partial reconsideration.

## I. BACKGROUND

The unfortunate events leading to this dispute are basically agreed upon by all parties involved. From January 1985 through March 1986, defendant Warren "Ricky" Franklin ("Franklin"), a businessman from Gretna, Virginia, induced 161 private investors to join the Futures Investment Group ("FIG"), a pool operated by Franklin that invested in the commodities market. These investors, many of whom were friends or relatives of Franklin, invested approximately $1.5 million during this fifteen month period. An investor could buy a share in FIG for $5,000.

After investigating several complaints that Franklin was illegally operating FIG, plaintiff Commodities Futures Trading Commission ("CFTC") filed a complaint and motion for an *ex parte* order freezing Franklin's assets on March 26, 1986.[1] Franklin had been trading on the Commodities Exchange through two Chicago brokers, Jack Carl Associates Inc. ("Jack Carl") and Rosenthal & Co. ("Rosenthal"). The complaint alleged that Franklin was operating FIG without registering with the CFTC, thereby violating section 4m of the Act.[2] On March 26, 1986, this court entered an Order freezing all of Franklin's assets, prohibiting the destruction of Franklin's records, and ordering him to show cause at an April 8 hearing why a preliminary injunction should not issue. Franklin failed to appear at the April 8 hearing, and this court entered a preliminary injunction against him.

Franklin was personally served with the freeze order on March 26, 1986, and he disappeared from Gretna shortly thereafter. Because Franklin was an extremely inept investor, his $1.5 million in collected funds had dwindled to less than $400,000 on March 26. On March 28, however, just two days after being served with the freeze order, Franklin unexpectedly mailed an additional $199,920.34 to the United Virginia Bank for deposit in his frozen account. *See* Report, Ex. 6. This sum represented 23 checks from FIG investors, some of which were dated as early as March 7, 1986. *See id.*

This court also appointed on April 8, at the request of counsel for the CFTC, Paul J. Pantano as the Temporary Equity Receiver ("Receiver") of the funds remaining in FIG. The Receiver was given the authority to monitor and/or liquidate all open accounts held by Franklin. Immediately after his appointment, the Receiver liquidated the FIG accounts and placed the receipts in a money market account insured by the FDIC. The Receiver has also diligently pursued all of Franklin's assets in an effort to reimburse FIG investors. To date, he has seized or attempted to seize eight (8) bank accounts, four (4) vehicles, several pieces of real property, office

---

1. The CFTC is an independent regulatory agency of the United States. It was established by the Commodity Futures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389. The CFTC has the authority and responsibility to enforce the provisions of the Act. *See* 7 U.S.C. § 1 *et seq.* (1982).

2. An amended complaint, filed April 2, alleged that Franklin also engaged in fraudulent practice in violation of 7 U.S.C. §§ 6b and 6o.

equipment and furniture, and $5,000.00 in cash which Franklin left his wife before departing. Several of these properties had outstanding liens and no one item produced an enormous amount of cash. However, the Receiver had accumulated $627,958.05 in the receivership account as of June 20, 1986. Report at 12.[3]

The Receiver has now prepared a summary of Franklin's available assets and a proposed plan for distribution. Among other things, he has proposed that checks deposited on March 28 after the freeze order ("post freeze deposits") be returned in full to the investors who wrote them. The Receiver contends that this deposit was legally prohibited by the freeze order and therefore cannot become part of the pool. He suggests that the remaining funds then be distributed on a pro rata basis. *Id.* at 14.

Numerous investors have objected to this portion of the Receiver's report. At a hearing, Mr. James Rupert argued as a private investor on behalf of at least 84 investors. He argued that *all* of their remaining funds should be distributed pro rata for several reasons: (1) the giving of funds to Franklin, rather than Franklin's deposit to the Bank, made an investor part of FIG and (2) FIG funds in Franklin's possession were commingled together by him and deposited in no particular order. Several other counsel and investors then echoed Rupert's sentiments. A smaller group of investors, presumably those who stand to gain by the adoption of the Receiver's plan, argued in favor of the proposal. Yet another group representative argued for a derivative of the "FIFO" accounting method,[4] whereby the first investors to join FIG would lose their total investment before successive investors lost any amount.

The Receiver has cited several cases in support of his position. He argues that due to this court's freeze order, Franklin was prohibited from transacting any further business with the FIG accounts, whether it be depositing, withdrawing, or trading funds. *See* Report at 7–19. He also argues that in a constructive trust, non-commingled funds such as the post-freeze deposits must be returned before commingled funds. After much deliberation, the court concludes for the following reasons that this portion of the Receiver's proposal should not be accepted.

## II. ANALYSIS

### A. The Freeze Order Did Not Prohibit Post-Freeze Deposits

The Receiver contends that the post-freeze deposits must be returned in full because they could not legally have been deposited by Franklin due to the freeze order. However, the language of the order should not be given such a restricted reading. The precise language of the freeze order of March 26, 1986 is as follows:

> B. IT IS HEREBY FURTHER ORDERED that all assets of Franklin and FIG be frozen and that they and any of their officers, directors . . . or any person in active concert . . . with any of them . . ., are prohibited from:
>
> 1. *Dissipating, concealing, withdrawing, or disposing* of, in any manner, any assets, choses in action, or other real or personal property of Franklin and FIG,. . . .

Freeze Order of March 26, 1986 (emphasis added).

Plainly, the literal language of the order prohibits only the dissipation or withdrawal of assets from FIG; it would not, for example, prohibit a local philanthropist who sympathized with the defrauded investors from adding $1 million to the existing assets. Neither this court, counsel for the CFTC, nor any other reasonable person

---

**3.** Approximately $173,655.79 was apparently spent by Franklin or is otherwise unaccounted for at this time. Report at 13.

**4.** "First in, first out." Several centuries ago, this concept was referred to as the "rule in Clayton's case." *See generally Ruddle v. Moore,* 411 F.2d 718 (D.C.Cir.1969). It has been widely criticized by, among others, the learned Judge Hand. *See In re Walter J. Schmidt & Co.,* 298 F. 314, 316 (S.D.N.Y.1923).

suspected on March 26 that Franklin would evidence either remorse or stupidity on March 28 and deposit nearly $200,000 into a frozen bank account. Freeze orders and similar injunctions are designed to "[prevent the] defendant from further dissipating the funds he allegedly has already misappropriated." *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir.1978). Not surprisingly, courts typically freeze accounts without giving serious thought as to who might *add* to the assets in a frozen account. However, public policy certainly should not discourage an individual from *depositing* funds into a frozen account, especially if the depositor is the same person who effected the fraud in the first place.

Therefore, absent explicit language to the contrary, a freeze order should not be construed to prohibit post-freeze deposits by persons aware of the freeze. Cases in which a bankrupt corporation has been required to return checks received after it was ordered to cease doing business are distinguishable. *Cf. In re Vermont Real Estate Investment Trust*, 25 B.R. 813 (D.Vt.1982) (monies remitted to real estate investment trust by investor after trust was precluded from issuing and selling its shares were subject to a constructive trust and therefore not part of the bankruptcy estate); *In re Bengal-Trading Corp.*, 12 B.R. 695 (S.D.Fla.1981) (trustee in bankruptcy must return in full those customer funds deposited after the date the bankrupt corporation was precluded by law from receiving additional customer funds). First, the language of those orders prohibited all business transactions, unlike the order in this case. Second, public policy in those cases demanded the return of late checks, where in this case, public policy favors that all investors be treated similarly. Because no explicit language in this court's order forbade additional deposits

into Franklin's frozen accounts, the court cannot agree with the Receiver that Franklin "was precluded from conducting further business as of the date of the freeze Order." *See* Report, p. 18. Rather, he was simply forbidden from trading in futures, withdrawing additional FIG money, or otherwise conducting business which might potentially *dissipate* FIG funds. Depositing $199,920.34 could in no way dissipate FIG funds and is thus permitted despite a freeze order.[5]

### B. All Funds Given to Franklin Were Commingled

The Receiver also concludes that post-freeze deposits should be returned in full because these deposits were not yet commingled with other FIG funds. In support of his proposal, the Receiver quotes the Restatement of Restitution,[6] which provides that funds of one claimant which have been "effectively separated" from the remaining funds should be returned to that claimant.

The court declines to take a broad reading of when one claimant's funds were "effectively separated" from the remaining funds. The evidence has been that Franklin stored each investor's check in his briefcase and used it randomly whenever he desired to make a purchase. Thus, some checks negotiated to Franklin on March 21 were deposited and used for trading prior to the freeze, while other checks given to Franklin on March 10 were not deposited until after the freeze. No one has suggested any mathematical formula or logical reasoning Franklin may have used in selecting these checks. Rather, he apparently grabbed a handful of checks that equalled the total cost of futures or option contracts he wished to purchase on a particular day. Apparently Franklin also deemed it necessary to retain marginal funds in his brief-

---

**5.** This conclusion is bolstered by the fact that the Virginia commercial code does not prohibit a collecting bank from depositing funds in a bank account frozen by a district court. *See* Va.Code §§ 8.4–202, 204 & 207.

**6.** "Where the wrongdoer has effectively separated the money of one of the claimants, that claimant is entitled to, and only to, his own money or its product." Restatement of Restitution, § 213(2).

case so that he could pay "dividends"[7] to those investors fortunate enough to request them periodically.

■ These facts suggest that the funds of FIG investors were truly "commingled" even before Franklin deposited them. *See* Black's Law Dictionary (5th ed. 1979) (defining "commingle" as the "[putting] together in one mass"). As the Receiver notes, these funds were certainly traceable to the extent the drawer's signature appeared on each uncashed check. But to the extent the checks were mixed together in Franklin's briefcase, could be used in any sequence at his discretion, and allegedly "earned interest" from the moment the check was delivered to Franklin,[8] these funds were, in a broad sense, "commingled." Therefore, checks not deposited after March 26 need not be returned in full to those investors simply because Franklin arbitrarily chose to use these funds at a later date. To the extent the Restatement of Restitution, § 213(2) states otherwise, the court declines to follow it in this context.

### C. Constructive Trusts Are Equitable Remedies

■ Finally, equity dictates that all FIG funds be distributed on a pro rata basis. When legal title to personal property is fraudulently obtained in Virginia, a constructive trust is imposed upon the property wrongfully obtained. *See Miller v. International Union of United Brewery,* 187 Va. 889, 48 S.E.2d 252 (1948). Constructive trusts are equitable remedies, designed to prevent unjust enrichment. *See* 76 Am.Jur.2d § 222. Funds held in constructive trust must be paid back before other creditors are paid. *See United States v. Fontana,* 528 F.Supp. 137, 146 (S.D.N.Y.1981). In this case, *all* FIG investors may claim a constructive trust because each was a victim of Franklin's fraud.

■ Because all FIG investors may claim a constructive trust over their investment funds, equity dictates that distribution be applied even-handedly if possible. The unique facts of this case call especially for an equitable distribution. During March 1986, Franklin received sixty-five (65) checks totalling approximately $440,000 from investors. He randomly selected forty-two (42) of these for deposit prior to the court's freeze order on March 26. Meanwhile, the remaining twenty-three (23) investors believed their funds were being used for trading and earning an immediate return. Instead, their checks were never deposited until two days *after* the freeze order. Returning 100% of the investment might provide a stroke of good fortune to those 23 investors, but it would also draw arbitrary boundaries harmful to the remaining investors. Equitable remedies such as constructive trusts should not perpetuate unreasonable results. Therefore, each FIG investor should receive the same percentage return on his investment. *See United States v. Benitez,* 779 F.2d 135 (2nd Cir.1985).

### D. The Place of the Fake Profits in the Distribution Formula

Having concluded that each investor will receive an equal pro-rata return, the final issue left to the court is the matter of deciding how to approach the fake profits

---

**7.** Franklin informed FIG investors that they could reinvest their "profits" into additional FIG shares or have these "dividends" distributed monthly. In reality, Franklin was paying these "profits" with the funds of more recent FIG investors who had just "bought into" the pool. The fake "profits" presented a dilemma for the receiver who was forced to decide how, if at all, these "profits" would affect the pro-rata distribution of the investors who received them. This dilemma is discussed in depth *infra* in part D of this opinion.

**8.** Mr. G.L. Simpson, a private investor, testified at the July 30 hearing that when he presented a check to Franklin and joined FIG, Franklin told him he "would be earning interest right now." Theoretically then, it is possible that an investor whose check was retained in Franklin's briefcase for several weeks and who requested that monthly dividends be distributed could have received "profits" before his investment check was ever negotiated. This is another example of Franklin's irrational and unorganized use of FIG funds and further indicates that the funds were "commingled."

received by some investors. In that these profits did not represent a return on capital but a simple redistribution of other investors' capital, any approach arrived at must ensure that no investor gains unduly or suffers unfairly as the result of Franklin's careless and random business practice.

It appears that the Receiver had four options in approaching these fake "profits" and the investors who received them: (1) the investors could return the "profits" to the entire pool prior to the pro rata distribution; (2) the investors could both retain their "profits" and demand a full pro rata share of their initial investments; (3) the investors could retain their distributed profits but would be forced to subtract that profit after determining the pro rata share of their investments; or (4) the investors could retain their "profits" but would receive a pro rata share based on their initial investments *minus* the profit distribution, i.e., profits would be subtracted before determining the investor's pro rata shares.

The first option is impracticable because it unrealistically would require some investors to return funds that they may no longer have on hand. The second option is inequitable because it rewards some investors for their random good fortune while depleting the share available to investors who were equally situated but merely less lucky.

The third and fourth options are the only equitable approaches because they both require the fortunate investors to account for payments received before they can obtain the benefit of a pro rata division of the residual receivership assets. In choosing between these two approaches previous case law provides little guidance. Only three previous American cases apparently have considered similar distribution problems. All three cases are ambiguous and do not precisely define whether the "profits" should be subtracted before or after determining the investors' pro rata share. *See In re Young,* 294 F. 1, 4 (4th Cir.1923); *accord In re Tedlock Cattle Co., Inc.,* 552 F.2d 1351, 1353–54 (9th Cir.1977); *In re Trending Cycles for Commodities, Inc.,* 27

B.R. 709, 711 (Bankr.S.D.Fla.1985). Even in this case the Receiver's initial description of a proposed formula is imprecise and can be read to advocate either of these proposed distribution methods. *See* Receiver's First Interim Report at 20–23.

In his motion for partial reconsideration the Receiver proposes that the court should endorse the approach requiring that the retained profits be subtracted after calculating the pro rata share. Assuming a person invested $10,000 and received $2,000 in profits, a calculation of the net distribution share would be as follows:

| | |
|---|---|
| $10,000 | initial investment |
| × .4 | (hypothetical pro rata multiplier) |
| $4,000 | gross pro rata share |
| − 2,000 | previously receive "profit" distribution |
| $2,000 | net distribution share |
| $4,000 | total recovered by the investor ($2,000 "profit" + $2,000 distribution share) |

This solution is arguably equitable because it forces the fortunate investors to account for previously received profits and gives all investors a relatively equal pro rata return on their initial investment. This formula is problematic, however, because it treats the fake "profits" as actual profits, a return exceeding the initial investment, as opposed to the reshuffled capital funds that they really were.

In its original order, the court endorsed the alternate approach; it wrote that "profits" should be subtracted before determining the pro rata share. *See CFTC v. Franklin,* 643 F.Supp. 386, 390 (W.D.Va. 1986). Assuming the same numbers used above, the calculation of a distribution share under this approach would be as follows:

| | |
|---|---|
| $10,000 | initial investment |
| − 2,000 | previously received "profit" distribution |
| $ 8,000 | |
| × .4 | |
| $ 3,200 | distribution share |
| $ 5,200 | total recovered by the investor ($2,000 "profit" + $3,200 distribution share) |

To compare the two approaches it is necessary to observe that under both formulas investors who realized no "profits" will receive the same return. Assuming a $10,000 investment and a 40% multiplier, an investor will receive $4,000 under each approach.

With that assumption in mind, it appears that the court's approach will lead to some inequality that would not result from using the Receiver's proposed formula. Under the Receiver's formula, all investors will end up with the same proportional total recovered. Under the court's formula, the investors who received profits *will* receive a somewhat greater total recovery than their less fortunate co-investors. Nonetheless, the court notes that *both* approaches do attain the equitable goal of forcing some accounting for the improperly distributed profits.

■ Of the two approaches, however, the formula that the court previously employed is the only one that leads to a relatively equitable economic division but also accurately treats the fake "profits" as merely redistributed capital. Not only is the court's approach therefore fair, it is also consistent with the factual findings in this opinion. Arguably, the solution proposed by the Receiver is economically even-handed. It, however, fails to address the problem posed by the fake "profits." The court prefers the more encompassing result reached by the formula proposed in the original memorandum opinion. When calculating the pro rata share of investors who have received "profits," the Receiver will therefore subtract the "profits" from the initial investment before determining the pro rata share.

The Receiver's Proposed Distribution Plan shall be partially accepted and partially rejected in an order to be entered this date.[9]

### AMENDED ORDER

For the reasons stated in an accompanying amended memorandum opinion filed this day, it is hereby

### ADJUDGED and ORDERED

that the Receiver's Proposed Order of Distribution, contained in the First Interim Report, be accepted in part and rejected in part. Section "A.2." of the proposed plan is rejected, and the remainder of the proposed plan is accepted. It is further ORDERED that the pro rata distribution of FIG's assets shall be based upon the total value of the fund on March 28, 1986, including the post-freeze deposits totalling $199,920.34. Finally, the court rejects the Receiver's treatment of so called "profits" in the formula for distribution, and it is hereby ORDERED that distribution will be consistent with Part D of the accompanying Amended Memorandum Opinion.

The Receiver shall not attempt to distribute the residual assets pursuant to this Order until all assets have been marshalled and appropriate costs and fees have been approved by the court.

The Clerk of Court is hereby ORDERED to send certified copies of this opinion and order to the following parties and counsel: Mr. Paul J. Pantano; Mr. Matthew J. El-kan; Mr. Stephen W. Widerman; Mr. David A. Melesco; Mr. Randy W. Sinclair; Mr. W. Carrington Thompson; Mr. James Kent, P.O. Box 299, Altavista, Virginia 24517; Mr. James Rupert, 111 Village Road, Lynchburg, Virginia; and Mr. Dean Brown, 205 Bedford Springs Road, Lynchburg, Virginia 24502.

To insure notice to FIG investors, copies shall also be sent to Susan Worley, The Altavista Journal, P.O. Box 239, Altavista,

---

9. Except for the deletion of "A.2.", which requests the complete return of these post freeze deposits, *see* First Interim Report p. 14, the Receiver's plan is accepted in full. Although the court adopts the Receiver's proposed distribution formula, *see id.* at 20, the court adheres to its own interpretation of that formula as set out in Part D *supra*. The court rejects the interpretation of the formula that the Receiver advocates in his motion for partial reconsideration. It should be noted that case law dealing with the distribution of frozen commodities accounts is scant indeed, yet the Receiver has done an admirable job of assembling for the court the relevant legal precedent.

Virginia 24512; Tim Davis, The Gazette, P.O. Box 550, Hurt, Virginia 24563; and Preston Moses, The Star-Tribune, P.O. Box 111, Chatham, Virginia 24531.