**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger, and Douglas C. Brandon, Defendants.**

No. 99 CIV. 11395 RWS.

United States District Court, S.D. New York.

March 21, 2000.

Securities and Exchange Commission by Thomas M. Melton, Salt Lake City, UT, Robert B. Blackburn, New York City, for Plaintiff.

Lambos & Junge by Armand P. Mele, New York City, for Stephen J. Cole–Hatchard, Cole–Hatchard Family Limited Partnership, Nicko Feinberg and Michael Olbermann.

Davis Weber & Edwards by Lyndon M. Tretter, New York City, Hotan & Hartson by E. Barrett Prettyman, Jr., Janet Pitterle Holt, Washington, DC, for Dr. Gene W. Ray.

Sheldon Weiss, Mountainside, NJ, for Thomas Stappas.

Wollmuth Maher & Deutsch by William A. Maher, New York City, Hall, Estill, Hardwick, Gable, Golden & Nelson by Donald L. Kahl, Heather E. Brown, Tulsa, OK, for Stephenson Equity Company.

Rosenman & Colin by Joel W. Sternman, New York City, for Robert Praegitzer.

Shearman & Sterling by Tai H. Park, New York City, for Advisor's Capital Investments, Inc.

Morrison & Foerster, by Carl H. Loewenson, Jr., New York City, for Receiver.

## OPINION

SWEET, District Judge.

Presently before the Court are a number of motions to intervene, pursuant to Rule 24, Fed.R.Civ.P., brought by a multitude of customers of defendants Credit Bancorp, Ltd. and Credit Bancorp, Inc. (collectively "Credit Bancorp"), including Robert Praegitzer ("Praegitzer"), Thomas Stappas ("Stappas"),[1]

---

**1.** Stappas, who is represented by Sheldon A. Weiss, Esq., is joined in his application by a number of other proposed intervenors, including Vincent J. Bagli ("Bagli"), Andrew and Regina

Stevenson Equity Company ("SECO"), Stephen J. Cole–Hatchard ("Cole–Hatchard"),[2] and Dr. Gene W. Ray ("Ray").[3] Non-party customer SECO has also moved to compel the court-appointed Receiver in this action, Carl H. Loewenson, Jr. (the "Receiver" or "Loewenson"), to release to SECO certain shares of unencumbered stock, as well as a cash dividend declared in February of 2000. For the reasons set forth below, the motions to intervene are granted, and SECO's motion to remit the dividend and return unencumbered shares is denied.

### Facts and Prior Proceedings

By complaint filed on November 17, 1999, the SEC initiated the instant enforcement action. Immediately thereafter, the SEC moved *ex parte* for a temporary restraining order and asset freeze preventing the defendants in this action, Credit Bancorp, Richard Jonathan Blech ("Blech"), Douglas C. Brandon ("Brandon"), and Thomas Michael Rittweger ("Rittweger") (collectively the "Defendants"), from, *inter alia*, dissipating assets and continuing to accept and deposit funds from potential investors. In addition to seeking an asset freeze, the SEC indicated its desire that a receiver ultimately be appointed in the action. The SEC's motion for a restraining order was granted, its proposed order (the "Temporary Restraining Order and Asset Freeze" or the "November 17th Order") was signed by the Court, and the matter was set down for hearing on the following day.

In its complaint and supporting papers, the SEC alleges the existence of a wide-ranging scheme to defraud by the Defendants. According to the SEC, Credit Bancorp solicited investments from a number of individuals or entities, many of which held significant quantities of restricted stock. In exchange for the promise of a not-insubstantial risk-free return on their stock, which could not otherwise be sold, and an undertaking that their stock would not be margined, pledged, or otherwise hypothecated, various investors provided Credit Bancorp with their securities for placement in "trust" accounts. The depositors' returns, so they were told, were to be generated by virtue of a line of credit extended based on the value of the securities placed in trust accounts.

Contrary to Credit Bancorp's assurances, the complaint alleges, the securities obtained from investors were not placed in trust accounts. Instead, the securities were placed in margin or cash accounts controlled by Credit Bancorp and Blech, and were in turn margined or sold.

On November 23, 1999, after several extensions of the Temporary Retraining Order and Asset Freeze, and after hearing argument from the representatives of various parties, the Court issued an order (the "November 23rd Order") altering the terms of the November 17th Order. In addition to enjoining the Defendants from future violations of the securities laws, freezing the assets of Defendants Credit Bancorp, Blech, and Rittweger, prohibiting the destruction of documents, granting the SEC expedited discovery, and requiring Credit Bancorp and all related entities to take all steps as are necessary to repatriate investor funds to the United States, the November 23rd Order appointed Loewenson as "Fiscal Agent" of Credit Bancorp, Blech, and Rittweger, with the authority to review and approve, among other things, all applications by those defendants for necessary transaction, any transactions

Calcago ("the Calcagos"), Richard J. DuPont ("DuPont"), Ronald DeYoung, Barbara DeYoung, George G. Luce, James F. Luce, Schwab & Case, Inc. Profit Sharing Plan ("Schwab"), Concetta G. Frato ("Frato"), Frank Mignogna ("Mignogna"), Kurt G. Richter ("Richter"), Stephen J. Robbins ("Robbins"), Leonard Zera ("Zera"), Lorraine Jankowski ("Jankowski"), and Steven Allen ("Allen"), Trustee for Lathrop Investment Trust and Harrington Group Irrevocable Trust. The above listing is not intended to be exhaustive, and for ease of reference this group of proposed intervenors shall be referred to herein as the "Stappas Intervenors."

2. Cole–Hatchard, who is represented by Lambos & Junge, is joined in his application by the Cole–Hatchard Family Limited Partnership (the "Cole–Hatchard Partnership"), Nicko Feinberg ("Feinberg"), and Michael Olbermann ("Olbermann"). For ease of reference these proposed intervenors shall be referred to herein as the "Cole–Hatchard Intervenors".

3. Ray has moved to intervene individually, as well as in his capacity as Trustee of the Ray Trust U.S.T. (the "Ray Trust").

on stock options purchased or sold by Credit Bancorp on behalf of its customers, and all requests to obtain additional collateral or to sell pledged securities in response to a notice of deficiency or a margin notice. Leave was granted for any application, upon notice, to modify the terms of the order.

Given the hectic pace of events in this action, the Court did not need to wait long for further application by the parties. On November 24, 1999, after an application by counsel to Credit Bancorp and certain other defendants, the terms of the November 23rd Order were temporarily modified in open court to allow Credit Bancorp to continue in the normal course of business, subject to various restrictions. In the course of remonstrating for that modification, counsel indicated that Credit Bancorp's line of business required it to engage in multiple transactions, many of them options transactions, and that requiring prior approval by the Fiscal Agent of all transactions would impose an undue hardship.

However, the continued operation of Credit Bancorp in the normal course of business was short-lived and problematic. On December 1, 1999, on consent, this Court ordered that the November 24th oral modification of the November 23rd Order would be terminated, and that the terms of the November 23rd Order would once again govern the activities of Credit Bancorp. On December 3, 1999, counsel for Credit Bancorp and Blech informed the Court that investor assets obtained by Credit Bancorp had, in fact, been impaired to a significant degree, and that investor funds had been used improperly to purchase both personal and real property. Certain of the securities deposited with Credit Bancorp had been used to secure margin credit, so the Court was informed, resulting in a margin deficit of at least $35 million. In addition to these revelations, it was relayed to the Court that certain margined assets had been liquidated to cover Credit Bancorp's margin deficits. In the wake of these revelations, Credit Bancorp and Blech indicated their willingness to consent to the entry of a preliminary injunction, asset freeze, and other such relief.

On January 21, 2000, after hearing vigorous argument from all parties and nonparties who wished to be heard, the Court granted a renewed request by the SEC for the appointment of a receiver of Credit Bancorp, transforming Loewenson from a "Fiscal Agent" with limited review and investigatory powers into a receiver with both the powers and the responsibility to ensure the protection and orderly marshaling of Credit Bancorp's assets. While the Court's January 21st Order Appointing Receiver provided the Receiver with a wide array of powers, that order stipulated that "[t]he Receiver shall not return to Credit Bancorp customers any securities or other assets deposited with Credit Bancorp or into an account in the name of Credit Bancorp or any dividends, interest, or other income or profits earned thereon or the proceeds from the sale of any securities or assets without further Order of this Court upon notice to all customers."

The intervention motions presently under consideration were filed on January 19, 2000, January 24, 2000, January 26, 2000, and January 31, 2000. SECO's request for the return of stock and distribution of cash dividends was brought by order to show cause on January 28, 2000, and the matter was set down for hearing on February 2, 2000.

Oral argument was heard on these matters on January 19 and February 2, at which time they were deemed fully submitted.

### Discussion

Although the facts underlying Credit Bancorp's transactions are complex, for the purposes of the motions presently under consideration the issues are relatively straightforward. A significant number of individuals or entities entrusted valuable securities or other assets to Credit Bancorp, allegedly under the expectation that those assets would be used to generate various rates of return under an arrangement that is not altogether clear. These individuals or entities, referred to throughout this action as either "investors" or "customers" depending on the outlook and concerns of the party or interested non-party,[4] were told

---

4. Depositors presumably prefer the term "cus-

tomer" to "investor," given concerns about their

that their stock would remain unencumbered, and that the securities entrusted to Credit Bancorp would remain unsullied and untouched within trust accounts structured for that very purpose. Unfortunately, this appears not to have been the case. Whether one calls them customers or investors, they did not get what they had bargained for—return without risk.[5]

While the Receiver is still in the process of untangling the financial arrangements that gave rise to this enforcement action, and the exercise of caution compels the Court to refrain from drawing any definite conclusions about the outcome of this litigation, one thing seems rather clear: More money was entrusted to Credit Bancorp than appears to be readily returnable at this time, and everyone wants their assets back as quickly as possible. This is not an uncommon phenomenon in enforcement actions by the SEC or other agencies such as the Commodities Futures Trading Commission ("CFTC"), especially where a financial fraud was structured along the lines of the classic "Ponzi" scheme—with earlier investors' returns generated by the influx of fresh capital from unwitting newcomers.

It is in this context that the instant motions have been submitted. Because of the large amounts of money that are at stake, and because a significant number of Credit Bancorp customers who deposited their stock in "trust" held restricted securities,[6] the issues in this case have been hotly contested at every step. The Receiver, whose task is, in part, to maximize and safeguard the assets

Credit Bancorp does have, has been buffeted from all sides by demands for the return of assets and accusations that he is not proceeding in the preferred fashion. The Receiver at once represents the interests of all and none of Credit Bancorp's customers, given the problem of collective action presented by the facts of this case. To the extent that the Receiver has the interests of all in mind, he is the adversary of the individual customer—whose concern is only for the return of his deposits.[7]

With this backdrop, the Court proceeds to the motions presently under consideration.

## I. SECO's Requests For The Return Of Unencumbered Shares And Distribution Of Cash Dividends Are Denied

■ SECO has asked that this Court order the Receiver (1) to return to its control all unencumbered shares of Vintage Petroleum, Inc. ("Vintage") stock in his possession, custody, or control; and (2) to remit to SECO cash dividends declared on all shares of Vintage stock, whether encumbered or unencumbered. Because the scheduled payment date for the Vintage cash dividend was February 3, 2000, SECO's demand for the return of securities and distribution of the dividends was brought by order to show cause and was accompanied by a request for expedited consideration. However, because the Court was not inclined to grant SECO the relief it sought, a decision was not forthcoming on the argument date. The delay in issuing this Opinion has perhaps provided SECO with some indication of the Court's

---

ultimate entitlement to a distribution should Credit Bancorp be liquidated and the remaining assets distributed according to a plan of priority. For the purposes of the instant motions, however, nothing turns on this semantic distinction. "Customer" and "Investor" shall be used interchangeably to refer to individuals or entities who entrusted their assets to Credit Bancorp.

5. It is worth questioning, of course, whether there is ever the possibility of return without risk, at least in legitimate dealings concerning assets so volatile as equity securities.

6. Because many of these customers also have a significant personal interest in the companies whose restricted stock they deposited, they are obviously vitally interested in the impact these

proceedings will have on the business affairs of the companies whose stock they held.

7. As the Eleventh Circuit noted in *SEC v. Elliott*, 953 F.2d 1560 (11th Cir.1992), *rev'd in part on other grounds*, 998 F.2d 922 (11th Cir.1993):

Generally, a receiver is nothing more than an opponent of one who claims secured status, but this scenario envisions only a one-on-one contest. In this case, the Receiver opposed many competing claims of secured status to the same property. Although the prevailing secured claimant had to fight the Receiver's opposition to the claim, he reaped benefits when the Receiver defeated competing claims. By combating competing claims, the Receiver became his ally.

*Id.* at 1577.

stance on its application, which is hereby denied.

According to SECO, in or about June of 1999, SECO entered into a written "Credit Facility Agreement" with Credit Bancorp, N.V., under the express terms of which Credit Bancorp was to establish a line of credit in favor of SECO. To secure this line of credit, SECO agreed to deposit eight million shares of Vintage stock into various trust accounts. This stock was purportedly to serve only as collateral for the Credit Facility Agreement, and title to the stock itself was to be held by the trustee, defendant Brandon. Beneficial ownership of the stock was to remain at all times with SECO.

In January of 2000, SECO requested, among other things, that the Receiver return its unencumbered Vintage stock and remit the anticipated cash dividend. The expected dividend was to be in the amount of $200,000, given SECO's original ownership of eight million shares of Vintage stock. SECO estimates that, while approximately seven million shares of its Vintage stock are arguably subject to third-party claims connected to Credit Bancorp's margin trading activities, approximately one million of its shares remain completely unencumbered. The Receiver denied SECO's application, in part because this Court's Order Appointing Receiver prohibited him from returning customer assets without further order of this Court upon notice to all customers. The Receiver also indicated his view that a partial return of assets to certain customers would not be practical without a "fuller picture of the ultimate disposition of the assets."

SECO presses that its request for the return of unencumbered assets is governed by the Credit Facility Agreement, which authorizes SECO to make an immediate demand for the return of its stock from Credit Bancorp should a variety of triggering events

occur. According to SECO, it has a right to the return of its property, and it possesses identifiable and distinct assets separate from those of other Credit Bancorp customers. In its papers, SECO also presses that its identifiable and segregable assets should not be used to buffer the losses of other defrauded Credit Bancorp investors.

SECO has also contended, both in its papers and during oral argument, that even if the assets of Credit Bancorp are distributed to its customers in an equitable fashion, it is entitled to the distribution it seeks. To this end, SECO points out that it was the largest Credit Bancorp customer, with its stock representing approximately 86.5% of the value of the securities entrusted to Credit Bancorp, and that equitable distribution will not entitle SECO to less stock than it now wishes returned.

At the outset, it is worth noting that SECO has not been alone in its demands for the return of its securities. Though oral argument on February 2 was limited to SECO's order to show cause and the various motions to intervene, a similar (omnibus) request has already been made by defendant Brandon in his capacity as "trustee" for a multitude of Credit Bancorp investors.[8] Additionally, the Court is aware of letters of other Credit Bancorp customers, sent to either the Receiver or the Court, anxious for the return of their monies or securities. Similarly, SECO is not alone among the pool of Credit Bancorp investors in its hostility to the prospect of equitable distribution. Certain other customers have made rather clear their individual desires that "Peter" not be robbed to pay "Paul" because of any fraud perpetrated by Credit Bancorp. Unfortunately, the common fisc available to satisfy the demands of all claimants would not appear to be large enough to make everyone whole.[9]

8. While Brandon's motion was submitted to the Court in connection with a conference held on December 3, 1999, and was filed by the Court on December 29, 1999, formal argument has yet to be heard on that motion. While the motion requested that the Court instruct the "Fiscal Agent" to "release, trade or transfer [stock], as per the investors' request, pursuant to the terms of the investor's CFA with CBL," it did not identify the specific transactions requested by the investors whose interests Brandon has sought to represent.

9. As in *CFTC v. Hoffberg*, No. 93 C 3106, 1993 WL 441984, at *2 (N.D.Ill. Oct. 28, 1993), "[w]e are faced here with the problem of a small pie and many disappointed investors."

However, given the record presently before the Court, it is not altogether clear at this point who are the "Peters" and who are the "Pauls" in this affair. As was noted at oral argument, the assets of certain of Credit Bancorp's customers might be presently identifiable or segregable only because the assets of other customers were previously expended to prevent their liquidation. Margin indebtedness on an account holding securities belonging to SECO may well have been discharged by virtue of payments at the expense of other Credit Bancorp customers. In other words, as with any Ponzi-type scheme, it may be the case that the assets of Peter are only fortuitously identifiable by virtue of the liquidation or encumbering of the assets of Paul. Moreover, to the extent that various assets were paid out by Credit Bancorp to satisfy the early demands of certain customers for the return of their funds, or were utilized improperly for any of the Defendants' personal benefit, it is only as a matter of chance, as far as we now know, that SECO's assets were not dissipated in lieu of those of its fellow customers.

Furthermore, the Receiver has not yet had the opportunity to complete his investigation into Credit Bancorp's finances, and it is not altogether clear how any distribution of assets will be handled. Depending upon how this case proceeds, Credit Bancorp may well be brought into bankruptcy and its assets liquidated and distributed by a bankruptcy court. A disgorgement order may also be proposed by the SEC, subject to review by this Court. The only thing certain at this point is uncertainty.

Uncertain, for example, are the various Credit Bancorp customers' respective entitlements to Credit Bancorp's assets, the priority of their interests in Credit Bancorp's assets vis-a-vis other third parties, such as banks and brokerage houses with security interests in margined securities, and the total amount of assets available to all for distribution.

SECO has pressed that, injuries to other Credit Bancorp investors notwithstanding, it would be inappropriate to distribute any of its identifiable assets to other investors. SECO cites no authorities for this proposition. Though it is too early to predict when and how the assets of Credit Bancorp will be distributed, this claim is worthy of some preliminary discussion.

Federal courts have come to rather different conclusions concerning the distribution of assets under an equity receivership. Certain courts have approved the return of traceable assets. *See Anderson v. Stephens,* 875 F.2d 76, 77–80 (4th Cir.1989) (holding, in context of CFTC enforcement action, that assets deposited into account after issuance of district court's freeze order could not be included in amount to be distributed *pro rata* among defrauded investors); *SEC v. P.B. Ventures,* Civ. A. No. 90–5322, 1991 WL 269982, at *2–3 (E.D.Pa. Dec. 11, 1991) (holding that proceeds directly traceable to stock invested with defendants must be distributed to original investors, rather than distributed *pro rata* among all investors affected by fraudulent scheme). Other courts however, based upon the facts and equities of the particular case, have approved *pro rata* distributions. *See, e.g., CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115–16 (9th Cir.1999); *United States v. Durham,* 86 F.3d 70, 73 (5th Cir. 1996); *United States v. Real Property Located at 13328 and 13324 State Highway,* 89 F.3d 551, 553 (9th Cir.1996) [hereinafter *Real Property*]; *United States v. Vanguard Inv. Co.,* 6 F.3d 222, 226 (4th Cir.1993); *Elliott,* 953 F.2d at 1569–70; *SEC v. Pavarini,* No. 88 CIV. 4897, 1989 WL 49365, at *2–3 (S.D.N.Y. May 3, 1989); *CFTC v. Franklin,* 652 F.Supp. 163, 168 (W.D.Va.1986), *rev'd on other grounds sub nom., Anderson,* 875 F.2d at 76. Despite SECO's pronouncement that it is unequivocally entitled to the stock it entrusted to Credit Bancorp under the Credit Facility Agreement, the absolutism of that entitlement is a matter of serious doubt. Defrauded investors frequently receive distributions *pari passu.*

Courts rejecting tracing in favor of *pro rata* distribution have done so under varying factual circumstances. However, the majority of the cited decisions authorizing *pro rata* distributions share the basic rationale that it would be unjust to allow one defrauded claimant to recover at the expense of another, merely because the former has the good

fortune of being able to trace his or her funds. As the Honorable William M. Hoeveler explained in *SEC v. Elliott:*

> To allow any individual to elevate his position over that of other investors similarly "victimized" by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less.... [I]n the context of [a] ... receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy.

No. 87–1212–CIV–Hoeveler, 1989 WL 90550, at *2 (S.D.Fla. Apr. 29, 1989), *aff'd in part and rev'd in part,* 953 F.2d 1560 (quoted in *Elliott,* 953 F.2d at 1569).

Just as the appointment of a receiver is authorized by the broad equitable powers of the Court, the argument goes, any distribution of assets by such a receiver is to be done equitably and fairly—with similarly situated investors or customers treated similarly.[10] *See Elliott,* 953 F.2d at 1569 (upholding district court's decision to distribute assets ratably, and observing that "the equities weigh against allowing some to benefit from the fortuity that Elliott had not sold all of the securities" whose return was sought; rejecting appellants' contention that their securities must be returned, given that "[l]egally, these investors occupy the same position as the other investors whose securities were sold," "[a]ll investors were defrauded," and "[a]ll investors were cleverly persuaded to part with their securities"); *see also Real Property,* 89 F.3d at 553 (affirming district court's determination that where "the struggle over the res derived from fraudulent

conduct is between innocent parties, tracing should not and will not apply"); *Durham,* 86 F.3d at 73 ("The lower court in this case chose not to impose a constructive trust in Claremont's favor because it seemed inequitable to allow Claremont to benefit merely because the defendants spent the other victims' funds first. Claremont would obtain a preferred claim over funds if the court were to impose a constructive trust. To the district court, all the fraud victims were in equal positions and should be treated as such.... Sitting in equity, the district court is a 'court of conscience.' Acting on that conscience, the lower court in the instant case rationally considered the positions of the victims and held that following the tracing principle would be inequitable."); *Vanguard Inv.,* 6 F.3d at 227 (holding that "a district court in its discretionary supervision of an equitable receivership may deny remedies like recission and restitution where the equities of the situation suggest such a denial would be appropriate"; noting that entitlement to assets under state law is not dispositive of entitlement under federal equity receivership).

A proposed distribution plan is not presently before the Court, and questions concerning the ultimate distribution(s) in this case are best left to another day. How the assets are to be best distributed is not a question that the Court is willing to prejudge.

However, because these issues remain unresolved SECO's motion must be denied. As counsel is no doubt aware, once assets have been distributed their retrieval may not be possible. *Cf. SEC v. Wozniak,* 33 F.3d 13, 14–15 (7th Cir.1994). The Court will therefore not allow the piecemeal distribution that SECO seeks.

---

10. In a letter submitted in opposition to SECO's application, non-party Advisor's Capital Investments, Inc. ("ACI") makes a similar point. As ACI notes:

> SECO's plight is in all material respects the same as that of Advisor's Capital customers and other investors. While Advisor's Capital customers placed cash with CBL rather than stock, the rights of the customers and the obligations of CBL were similar: hold the assets

> safely, get a return through "riskless" arbitrage trading and have control over the princip[al] and profits (including an immediate return of the assets upon demand).... [W]hether CBL has an obligation to investors, by contract or otherwise, is simply not the issue. The question is how the Receiver can best protect all investors' interests where the available assets are insufficient to make each investor whole.

## II. *Intervention Shall Be Allowed*

The proposed intervenors, SECO among them, have separately moved for intervention in this SEC enforcement action. In the main, their contentions are similar, and all proposed intervenors highlight their vital interest in the assets presently controlled by the Receiver. More specifically, they claim, *inter alia*, that (1) they have significant interests in the (limited) assets at issue in this litigation; (2) their interests in the assets currently frozen may be impaired depending on the outcome of the instant action; (3) the SEC is an inadequate representative, given that its goals and interests are not aligned with those of individual Credit Bancorp customers; (4) that allowing intervention would not delay resolution of this action, insofar as the SEC's discrete claims are concerned, and that the addition of the intervenors' claims will not unduly complicate matters.

The SEC has opposed such intervention, contending that (1) Section 21(g) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78u(g), bars such intervention without the SEC's consent; (2) Credit Bancorp's customers have no right to intervene under Rule 24(a), Fed.R.Civ.P., because their collective interests are actively represented by both the SEC and the Receiver; and (3) permissive intervention should not be allowed under Rule 24(b), Fed.R.Civ.P., as intervention would serve only to multiply the issues at play in this action and would inhibit the SEC from proceeding expeditiously. With respect to permissive intervention, the SEC notes that approximately 200 individual customers may well endeavor to intervene in this action, that it would be unfair to allow some investors to intervene but not others, and that the end result of this will be a logistical nightmare. The SEC also notes that intervention by Credit Bancorp's customers could expose the SEC itself to customer claims, thus requiring it to divert valuable resources from its enforcement efforts.

Furthermore, the SEC notes that intervention in this action is problematic, in that jury trials in enforcement actions are limited in scope and the intervenors have brought a multitude of claims that would appear to require resolution by a jury. These claims, the SEC presses, will require specific discovery, both prolonging this litigation and unnecessarily increasing the confusion and complexity already inherent to such actions.

While the Court is not of the opinion that intervention as of right under Rule 24(a) is appropriate, permissive intervention shall be allowed under Rule 24(b).

First to be considered will be the SEC's position that, setting aside any inquiry into the demands of Rule 24, Section 21(g) absolutely bars intervention in any SEC enforcement action without the SEC's prior consent.

Section 21(g) states as follows:

Notwithstanding the provisions of section 1407(a) of Title 28, or any other provision of law, no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission.

15 U.S.C. § 78u(g).

A review of the authorities offered by both the SEC and the movants reveals that there is disagreement within the courts concerning the application of Section 21(g) to intervention motions. *Compare SEC v. Flight Trans. Corp.*, 699 F.2d 943, 950 (8th Cir.1983) (rejecting Section 21(g) as bar to intervention in SEC enforcement actions); *SEC v. Prudential Sec. Inc.*, 171 F.R.D. 1, 4 (D.D.C. Mar.26, 1997) (rejecting Section 21(g) as a bar to nonconsensual intervention in certain SEC actions), *with SEC v. Wozniak*, No. 92 C 4691, 1993 WL 34702, at *1 (N.D.Ill. Feb.8, 1993) (holding that Section 21(g) operates as "impenetrable wall" to intervention by victim of fraudulent scheme in SEC enforcement action); *see also SEC v. Qualified Pensions, Inc.*, No. Civ.A. 95–1746–LFO, 1998 WL 29496, at *3 (D.D.C. Jan. 16, 1998) (holding that, as applied to case in which applicants for intervention "are already plaintiffs in another ongoing lawsuit and that the matter on which they wish to expound ... is squarely before the other court," Section 21(g) bars intervention; noting that allowing intervention would effectively allow coordination of

enforcement action with lawsuit already pending in another jurisdiction).

■ As was noted in *SEC v. Prudential Securities,* however, "there is no persuasive authority which suggests that section 21(g) . . . bars intervention in all SEC enforcement actions." 171 F.R.D. at 3. Not only does the specific language of Section 21(g) not apply, on its face, to intervention, but the vast majority of cases addressing intervention in the context of SEC enforcement actions neglect to discuss Section 21(g) at all. Instead, intervention has been typically evaluated under the standards governing Rule 24, Fed. R.Civ.P.

It is true that the legislative history of Section 21(g) references *SEC v. Everest Management Corp.,* 475 F.2d 1236 (2d Cir. 1972), a decision in which the Second Circuit denied the victims of an alleged fraud both as of right and permissive intervention, for the proposition that the combination of public and private actions is often problematic. *See* S.Rep. No. 94–75, 94th Cong. 1st Sess. at p. 8(B), 1974 U.S.Code Cong. & Admin.News pp. 179, 187 (1975). Nevertheless, as the 8th Circuit held in *SEC v. Flight Transportation:*

[T]he purpose of the subsection is simply to exempt the Commission from the compulsory consolidation and coordination provisions applicable to multidistrict litigation. It does not say that no one may intervene in an action brought by the SEC without its consent. It does not mention Fed. R.Civ.P. 24, nor does Rule 24 contain any clause giving special privileges to the SEC.

Given that the language of Section 21(g) does not specifically prohibit intervention in SEC enforcement actions, and the persuasive reasoning of those cases that have rejected Section 21(g) as an absolute bar to intervention, Section 21(g) does not bar intervention in this case.

Having determined that intervention is not absolutely barred by Section 21(g), attention must then be focused upon the criteria set forth in Rule 24.

■ As Rule 24(a)(2), Fed.R.Civ.P., states: Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In this Circuit intervention as of right is permitted only if an applicant has fulfilled all of the following requirements: (1) filed a timely application; (2) shown an interest in the action; (3) demonstrated that such an interest would be impaired by the disposition of the action; (4) shown that the interest is not adequately protected by existing parties to the action. *See New York News, Inc. v. Kheel,* 972 F.2d 482, 485 (2d Cir.1992). Failure to satisfy any one of these elements constitutes sufficient grounds to deny an intervention application. *United States v. New York,* 820 F.2d 554, 556 (2d Cir.1987).

Rule 24(b)(2), which governs permissive intervention, reads as follows:

Upon timely application anyone may be permitted to intervene in an action . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The proposed intervenors press that intervention is required under Rule 24(a), given that this action will have a profound impact upon their interests in those assets entrusted to Credit Bancorp. To this end, they have cited the Eighth Circuit's decision in *SEC v. Flight Transportation Corp.* for the proposition that intervention is necessary where the only assets available to proposed intervenors are inadequate, and will be disposed of in the SEC enforcement action. In that case, the court reversed the district court's determination that intervention as of right by several creditors was inappropriate, in part because the proposed intervenors' interests in collecting on a judgment could be impaired by the outcome of the enforcement proceedings. *See id.* at 947–49.

The movants are certainly correct in observing that their interests are at stake in the instant action. As the earlier discussion regarding SECO's order to show cause hopefully makes clear, the manner in which the instant action proceeds will have profound implications for Credit Bancorp customers desirous of the return of their assets. Because its holdings may not be sufficient to satisfy the claims of all, as a practical matter the instant action will affect the rights of non-party customers. After all, even if customers continue to press their individual claims against the self-same defendants in this enforcement action, there may be nothing left at the end of the day to satisfy a judgment.

It is also the case that the SEC's interests in this action are not coextensive with those of individual Credit Bancorp customers. The SEC's interests lie in enforcing the securities laws, protecting the public from frauds, and ensuring that Credit Bancorp customers as a whole recover their due. Like the Receiver, the SEC's broader mission may well mean that it will take positions hostile to those of individual investors.

■ However, the conclusions to be drawn from these observations do not necessarily militate in favor of intervention as of right, and it is worth noting that the majority of courts to have considered the subject of investor intervention under analogous circumstances have denied intervention. *See, e.g., CFTC v. Chilcott Portfolio Management, Inc.,* 725 F.2d 584, 586 (10th Cir.1984); *CFTC v. Heritage Capital Advisory Servs.,* 736 F.2d 384, 386–87 (7th Cir.1984); *Everest Management,* 475 F.2d at 1239–40; *SEC v. Charles Plohn & Co.,* 448 F.2d 546, 549 (2d Cir.1971); *FTC v. Jordan Ashley, Inc.,* No. 93–2257–CIV–NESBITT, 1995 WL 792076, at *2–3 (S.D.Fla. June 15, 1995); *SEC v. Byers,* 109 F.R.D. 299, 302–03 (W.D.Pa.1985); *SEC v. Reed,* 97 F.R.D. 746, 748 (S.D.N.Y. 1983); *CFTC v. Carter, Rogers & Whitehead & Co.,* 497 F.Supp. 450, 452–53 (E.D.N.Y. 1980); *SEC v. Canadian Javelin, Ltd.,* 64 F.R.D. 648, 650–51 (S.D.N.Y.1974), *appeal dismissed,* 538 F.2d 313 (2d Cir.1976). *But see SEC v. Navin,* 166 F.R.D. 435, 441 (N.D.Cal.1995) (permitting investor to intervene as of right in enforcement action). Insofar as intervention as of right is concerned, *SEC v. Flight Transport* is, in many respects, an outlier opinion.

While the proposed intervenors paint a stark picture of their potential plight were the Court to deny intervention as of right, it is not at all clear that participation in an enforcement action is an all-or-nothing affair. In analogous SEC or CFTC enforcement actions, non-party investors often participate in summary proceedings determinative of their entitlement to receivership assets. *See Elliott,* 953 F.2d at 1566–67. Indeed, were the Court to deny Credit Bancorp's customers an opportunity to be heard concerning any distribution plan, it is conceivable that the due process rights of those nonparties would be compromised. A number of courts have relied on the existence of this form of participation in denying investors' motions to intervene in enforcement actions. *See Chilcott,* 725 F.2d at 586 (affirming denial of intervention, given that "the claims procedures set up by the Receiver will permit [investor] Barber to protect his claimed interest in the assets presently under the control of the Receiver"); *Heritage Capital,* 736 F.2d at 386 (affirming denial of motion for intervention as of right by investor in CFTC enforcement action, as investor was able to either assert its claims in the "claims procedure established by the receiver and supervised by the district court" or to sue court-appointed receiver directly for return of assets; noting that "there is no question that Saelens may obtain district court review of any unfavorable decision of the receiver before the receiver disburses funds to other creditors," and that Saelens' claims of superior right would therefore not be impaired if presented in forum other than a main CFTC enforcement action); *Jordan Ashley,* 1995 WL 792076, at *3 (denying motion to intervene brought by non-party, ostensibly to protect alleged interests in specific receivership assets, in part because of the adequacy of summary proceedings to resolve asset-related disputes); *Cf. Charles Plohn & Co.,* 448 F.2d at 549 ("Appellants suffered no prejudice from the denial of their motion to intervene inasmuch as they were given a fair and complete opportunity to be heard in opposi-

tion to the motion to sell the seats. They were served with notice of motion, they were permitted to file papers, submit proof, and be heard on oral argument.").

If, as a number of intervenors assert, their primary interests lie in safeguarding their rights to assets presently held by the Receiver, then summary proceedings would presumably be adequate to the task at hand. Such proceedings are relatively commonplace where an equity receiver has been appointed to marshal assets, and the handling or distribution of those assets is a matter of dispute. *See SEC v. American Capital Inv., Inc.,* 98 F.3d 1133, 1146–47 (9th Cir.1996), *overturned on other grounds by, Steel Co. v. Citizens for a Better Env.,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *SEC v. Wencke,* 783 F.2d 829, 835–37 (9th Cir.1986); *United States v. First Wall Street SBIC,* No. 97 CIV. 2655(JSR), 1998 WL 352966, at *1 (S.D.N.Y. June 26, 1998).

Furthermore, while the SEC may not have an interest in advancing the claims of one defrauded investor at the expense of the other, several courts have held that the SEC or other governmental agencies in analogous enforcement actions sufficiently represent investor interests for the purposes of Rule 20(a)(2). *See Qualified Pensions,* 1998 WL 29496, at *4 (holding that interests of proposed intervenors adequately represented by SEC); [11] *Heritage Capital,* 736 F.2d at 386–87 (concluding that CFTC adequately represented interests of investor). *But see Navin,* 166 F.R.D. at 441–42.

Consequently, intervention under Rule 24(a) would not appear to be appropriate. However, the Court's inquiry under Rule 24(b) is a different matter.

The argument typically advanced to defeat permissive intervention in cases such as this is that intervention would unduly delay the resolution of the enforcement action, and that allowing private parties to press their claims alongside the SEC would add an unwelcome layer of complexity outweighing any advantage of a single disposition of common issues.[12] It was under this line of reasoning that the Second Circuit affirmed the district court's denial of intervention in *SEC v. Everest Management,* 475 F.2d at 1240. Intervention has been traditionally disfavored, given courts' hesitation to allow scores of investors and other interested persons from becoming full-fledged parties to governmental enforcement actions. *Cf. Chilcott,* 725 F.2d at 586 (noting district court's preference that interested investor assert claims through claims procedure established under district court's equity powers, rather than becoming, along with numerous other persons, a full-fledged party to action).

However, as the Second Circuit also noted in *Everest Management,* 475 F.2d at 1240, Rule 24(b) also vests broad discretion in the district court to determine the fairest and most efficient manner of handling a case with multiple parties and claims.

■ Under the facts of the instant case, and given that the proposed intervenors are likely to have extensive participation in this case whether or not intervention is allowed, the Court will allow intervention under Rule 24(b). As a practical matter, it is doubtful that intervention by the Credit Bancorp customers in this case will prolong the SEC's involvement in this matter or complicate the SEC's efforts to obtain a resolution of its claims against the named defendants. For example, to the extent that the SEC seeks to obtain a consent judgment against some or all of the defendants in this action, the ministrations of customers intervening in the action are likely to have little, if any, impact. Moreover, nothing requires the SEC to continue its participation in this action once it has obtained the relief it seeks on its discrete claims.

---

11. More specifically, the *Qualified Pensions* court explained that:

> After all, the SEC exposed the fraud at the core of both this suit and applicant's case in California. It is statutorily commissioned to represent the interests of individual investors in the public at large, such as applicants.

1998 WL 29496, at *4.

12. A similar line of reasoning has been invoked in opposition to the maintenance of cross-complaints or third-party practice in SEC enforcement actions. *See SEC v. General Host Corp.,* 60 F.R.D. 640, 642 (S.D.N.Y.1973), *aff'd,* 508 F.2d 1332 (2d Cir.1975).

Given the broad discretion granted to this Court under Rule 24(b) to determine the fairest and most efficient method of handling a case with multiple parties and claims, intervention is appropriate.

This ruling concerning intervention shall be conditioned upon the requirement that intervenors not simultaneously maintain parallel lawsuits in any other jurisdiction.

*Conclusion*

For the reasons set forth above, the motions for leave to intervene are granted, to the extent that they seek permissive intervention under Rule 24(b), Fed.R.Civ.P., and SECO's motion for the return of stock and dividends is denied.

It is so ordered.

